Charles Edward **DAVIS**, Plaintiff,

v.

**LYNBROOK POLICE DEPARTMENT, a municipal entity, Joseph Neve, Chief of Police, individually and in his official capacity, and Detective James Curtis, individually and in his official capacity, Defendant.**

**No. 98CV0015(ADS)(MLO).**

United States District Court, E.D. New York.

Sept. 17, 2002.

Charles Edward Davis, Beacon, NY, Plaintiff Pro Se.

Thurm & Heller, LLP, New York, NY (Milton Thurm, Angel Rios, of Counsel), for Defendants Lynbrook Police Department and Joseph Neve.

Kral, Clerkin, Redmond, Ryan, Perry & Girvan, New York, NY (Jeffrey K. Van Etten, of Counsel), for Defendant James Curtis.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Charles Edward Davis ("Davis" or the "plaintiff") commenced this action by filing a complaint on December 30, 1997, alleging that Detective James Curtis ("Curtis" or a "defendant"), Joseph Neve ("Neve" or a "defendant"), and the Lynbrook Police Department ("LPD" or a "defendant") (collectively, the "defendants") deprived him of his constitutional rights in violation of 42

U.S.C. § 1983. Presently before the Court is a motion by Neve and the LPD (collectively, the "Lynbrook Defendants") for summary judgment.

## I.  BACKGROUND

### A.  The Parties

For the purpose of deciding the Lynbrook Defendants' motion for summary judgment, the following facts are undisputed unless otherwise indicated. The LPD is a department within the Village of Lynbrook. Neve became a member of the LPD on February 8, 1977 and has been Chief of the Department since his appointment in March 1991. Curtis was appointed as a police officer for the LPD on March 19, 1973.

### B.  Curtis' June 7, 1993 Automobile Accident

On June 7, 1993, Curtis was involved in a line-of-duty automobile accident in which he allegedly sustained injuries to his neck, back, left wrist, and elbow. The Lynbrook Defendants allege that as a result of these injuries, Curtis was on "partial disability leave" and was not assigned to full-time police duty on April 12, 1995, the date of the incident at issue in this case. They also allege that Curtis had not been on active police duty for more than one year preceding April 12, 1995. Davis alleges that despite being on "partial disability leave," Curtis continued to work as a police officer, making arrests and assisting other arresting officers, arrests from June 7, 1993 through April 12, 1995.

On December 8, 1993, Curtis informed Neve that he had applied for disability retirement to the New York State & Local Retirement System based on the injuries he sustained on July 7, 1993. On January 14, 1994, in connection with that application, Curtis signed an authorization for the release of his medical records to the Medical Board of the Retirement System. On August 18, 1994, Neve submitted Curtis' medical records to the New York State & Local Retirement System. On February 7, 1995, Neve rescinded his request for an appeal regarding Curtis' disability pension, "[i]n light of recent medical evidence." On June 13, 1995, Neve informed one John Black, an attorney who works in an unknown capacity for an unidentified state organization, that the Nassau County District Attorney ("NCDA") had been advised that Curtis submitted his brother's x-rays to the New York State & Local Retirement System in an attempt to receive a disability pension. Curtis' brother had been granted a disability pension on or about September 22, 1990. The Lynbrook Defendants maintain that Curtis' application for a disability retirement was still pending on April 12, 1995, but Davis disputes that allegation.

### C.  The Surveillance of Curtis

In a report to Neve dated March 5, 1995, one Clifford S. Trotter ("Trotter"), a private investigator, detailed the information he had gathered regarding Curtis. The first two paragraphs of the report confirmed that Neve had contacted Trotter's firm and asked Trotter to "initiate discreet surveillance operations relating to James E. Curtis." The report states that Neve had informed Trotter that Curtis was not working due to a disability, and that Neve had asked Trotter to determine Curtis' current activities. The report describes Trotter's observations of Curtis on three consecutive Thursdays: February 16, February 23, and March 2, 1995.

### D.  The April 12, 1995 Incident

On April 11, 1995 at approximately 11:00 p.m., Curtis, wearing civilian clothes, went to the Swiss Tavern in Lynbrook, where

468

he played darts and drank until 3:00 a.m. on April 12, 1995. When Curtis left the Swiss Tavern, he drove south on Ocean Avenue. The plaintiff, who also was driving south on Ocean Avenue, was on his way to Tri–State Newspapers, Inc., where he worked as a substitute newspaper carrier. The plaintiff was driving behind Curtis and saw the blue Cadillac that Curtis was driving swerving from side to side. The plaintiff thought the driver of the Cadillac might be drunk, so he "kept his distance".

Curtis pulled his car to the side of the road, allowing the plaintiff to pass. After Davis passed Curtis, Curtis resumed his drive south on Ocean Avenue, now following Davis. Davis observed the driver of the car behind him flashing his high beams and assumed that the driver needed assistance. Davis pulled his vehicle off to the side of the road.

Davis stopped his car, rolled down the driver's side window, and waited for the other motorist to stop his car. Davis had been driving with his high beams on because one of his headlights was not working properly. Curtis pulled up alongside Davis' car, yelled at Davis to get his lights fixed, and screamed profanities and racial slurs at him. Davis noticed that Curtis' speech was slurred and concluded that Curtis was drunk. Davis responded by saying, "All right, no problem," and drove away.

Curtis pulled out behind Davis and began following him. Curtis put on his high beams, "deliberately blinding" Davis, and tailgated Davis' car. Davis continued to the intersection of Ocean and Atlantic Avenues, where he stopped at a red light. Curtis stopped next to Davis' car. When Davis turned to look at Curtis, he saw that Curtis was grinning. Davis turned back to the light and waited for it to turn green, at which point Curtis said to Davis, "[H]ey

asshole, hey asshole." Davis kept looking straight ahead at the light, and Curtis said to him, "[H]ey asshole, I'm a cop". Davis saw Curtis flash something silver, which Davis assumed was a badge.

Davis made a left turn onto Atlantic Avenue, and Curtis followed him. Davis made a right turn onto Access Road, which opened into the parking lot behind the Tri–State Newspapers warehouse. Curtis followed Davis onto Access Road. At this point, Davis became frightened because Access Road is not regularly traveled and is not well-lit. Davis drove quickly down Access Road, parked his car in the Tri–State Newspapers parking lot, and started walking toward the warehouse because he knew people would be inside.

Davis turned and saw Curtis' blue Cadillac enter the parking lot and come to a stop. Curtis jumped out of his car drawing a Smith & Wesson nine-millimeter semi-automatic firearm. Curtis pointed the weapon at Davis and asked him, "[Y]ou think I'm a cop now?" Curtis asked Davis where he was going, and Davis responded that he was on his way to work. Curtis asked Davis where he worked, and Davis replied that the worked in the warehouse in front of which they were standing. Curtis, who was still pointing the gun at Davis, told Davis to lie face-down on the ground, and Davis complied. Curtis threatened Davis, saying that "he had a license to kill niggers" and that "he could kill [Davis], get away with it." Davis began screaming desperately for help.

Byron Perez ("Perez"), one of the workers inside the warehouse, heard Davis' screams. Perez went to the rear of the warehouse, opened the door, and stepped into the parking lot. There, he saw Davis lying face-down on the ground with his hands behind his back and Curtis standing over him with a gun pointed at him. Curtis identified himself as a police officer and

showed Perez what appeared to be a badge. Perez noticed that Curtis appeared intoxicated. Perez did not know Davis personally but knew that he was an employee. Davis yelled to Perez, "tell him I work here." Perez told Curtis that Davis was an employee at the newspaper facility. After receiving this information, Curtis holstered his gun or tucked it in his belt.

Perez called to his brother-in-law, Edwin Morales ("Morales"), another worker at the newspaper facility. Morales went to the rear of the warehouse, opened the door, and saw a man pointing a gun at another man. Morales told Curtis to lower the gun, but Curtis refused and instead showed him a silver bade and directed him to call 911. Morales went inside and told a co-worker to call 911. When Morales returned to the parking lot, Curtis identified himself as a police officer.

After Curtis holstered his gun, Davis stood up, and the two men began to argue. Curtis asked Davis for identification, and Davis began walking toward his car. Curtis came up behind Davis and pushed him. Davis turned around and pushed back. The argument escalated into a shoving match, and Davis grabbed Curtis' gun from his waistband.

Davis pointed the gun at Curtis and asked him, "Who are you?" Curtis did not respond. Morales heard Davis tell Curtis, "I'm going to kill you," but Davis. denies having made such a threat. Curtis ran toward the warehouse, and Davis squeezed the trigger of Curtis' gun. The trigger did not move. Curtis ran into the warehouse through the back door, and Davis ran after him with the gun. As Davis ran by his co-workers, they yelled to him, "Don't do it!"

Davis encountered Curtis inside the warehouse. He pointed the gun at Curtis, "[p]ulled the top piece of the gun back," and told Curtis to stop and get on the ground. Davis wanted to hold Curtis in the warehouse until the police arrived, so he tried to hit Curtis to the ground by striking him across the back. Instead, Davis hit Curtis on the head with the gun. The gun discharged, and a bullet lodged in Curtis' brain. As a result of the shooting, Curtis is unable to speak, unable to see out of one eye, and is partially paralyzed.

After the incident, the Nassau County Medical Examiner's Office determined that Curtis' blood alcohol level at the time of the shooting was .16. The Medical Examiner's Office found traces of marijuana in his blood as well.

On September 27, 1996, following a jury trial, Davis was found guilty of Attempted Murder in the Second Degree, Attempted Manslaughter in the First Degree, Criminal Use of a Firearm in the First Degree, Assault in the First Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. In a decision dated February 8, 1999, the Appellate Division, Second Department, unanimously affirmed Davis' judgment of conviction. *People v. Davis*, 258 A.D.2d 528, 685 N.Y.S.2d 455 (2d Dept.1999). On April 28, 1999, the Court of Appeals denied Davis' application for leave to appeal to that Court. *People v. Davis*, 93 N.Y.2d 898, 689 N.Y.S.2d 710, 711 N.E.2d 986 (1999).

## E. Davis' Criminal Complaint

Sometime between April 12 and April 20, 1995, Davis filed a criminal complaint with the NCDA alleging that Curtis "engaged in various acts of criminal conduct in connection with a series of incidents that occurred ... on April 12, 1995." On or about April 20, 1995, the NCDA commenced an investigation into Davis' allegations, and on June 21, 1995 determined that "there is insufficient evidence to war-

rant its seeking to initiate a criminal prosecution against Curtis in connection with the matters set forth in Davis' [complaint]."

### F. Curtis' Applications for Benefits

On or about March 7, 1996, Curtis filed an application with the New York State & Local Retirement Systems for accidental disability retirement benefits for the injury he suffered on April 12, 1995. A hearing was held and, in a decision dated June 25, 1999, the New York State Comptroller denied the application, finding that "the applicant has failed to meet the burden of proof necessary to establish that the incident in question was an accident sustained in the service upon which his membership is based." Curtis appealed the decision to the Appellate Division, Third Department. In a decision dated March 15, 2001, the Appellate Division affirmed the Comptroller's determination that Curtis did not sustain an accident while in service. *See Curtis v. New York State Comptroller*, 281 A.D.2d 780, 722 N.Y.S.2d 116 (3d Dept. 2001).

Curtis also applied for workers' compensation benefits, and in a decision dated February 17, 1999, the New York State Workers' Compensation Board awarded Curtis the benefits he sought. In particular, the Workers' Compensation Board found that Curtis had "proven that the accident occurred in the course of employment."

### G. Prior Criticisms and Complaints Regarding Curtis' Conduct

In his affidavit in opposition to the Lynbrook Defendants' motion, Davis describes nine criticisms and complaints different people had made regarding Curtis' conduct as a police officer. In their reply affirmation, the Lynbrook Defendants do not deny the existence of these complaints.

Rather, they assert that "the complaints lodged against Curtis during his twenty two years of service were either unsubstantiated or not the type which would have placed the [LPD] on notice he possessed a potential threat to the rights of the public." Because the Lynbrook Defendants do not assert that the complaints were not filed, the Court finds that their existence is undisputed. Accordingly, a brief discussion of the complaints follows.

#### 1. March 28, 1974

In a report to the Commanding Officer of the LPD, dated March 28, 1974, one Sergeant M. French ("French") wrote that at 2:30 that morning, he responded to a disturbance call at the Twin Harps Bar. When French entered the bar, he saw Curtis who called him over and said that he wanted to arrest one Mounir Mina ("Mina") for harassment. Curtis told French that Mina had been "giving him a hard time." French observed that Curtis "had had quite a bit to drink," and advised Curtis to go home. French returned to headquarters, telephoned the bar, and spoke to Curtis. He again advised Curtis to home and get some sleep. Later that night, French learned that Curtis was in Brooklyn at the 69th Precinct of the New York City Police Department, where he was having Mina arrested.

In a report dated March 29, 1974, one Lieutenant Tierney ("Tierney") advised the Commanding Officer of the LPD of the March 28, 1974 incident involving Curtis at the Twin Harps Bar. In addition to the information contained in French's report, Tierney stated that Curtis had "chased" Mina from Lynbrook to the 69th Precinct in Brooklyn. Tierney also reported that Curtis and Mina dropped the charges they had filed against one another. Tierney wrote that he spoke on the telephone with Curtis while he was still at the 69th Pre-

cinct and advised him that he should not have chased Mina to Brooklyn and was in danger of losing his job.

## 2. July 8, 1974

In a report to the Commanding Officer of the LPD, dated July 8, 1974, French wrote that at 6:30 p.m. that day, one Richard Michaels ("Michaels") arrived at the LPD headquarters to complain about the conduct of a Lynbrook police officer. Michaels explained that he was stopped at a red light on Sunrise highway when a Camaro stopped next to him. The driver of the Camaro looked over at Michaels and revved the motor of his car. When the light turned green, both cars proceeded forward, and the driver of the Camaro cut in front of Michaels, almost hitting his car. The cars continued along Sunrise Highway, and the driver of the Camaro again cut in front of Michaels and stopped his vehicle. The driver exited his car, walked up to Michaels, and said that he was a police officer and that his shield number was "1010." The police officer demanded to see Michaels' license, registration, and insurance card. Michaels produced his license and registration and said that he did not have an insurance card because he had rented the car. The police officer called Michaels a "scum bag" roughly 15 times and said, "[I]f I ever get you in Lynbrook you will get a load of tickets." Michaels noticed that the police officer was carrying a gun. At the bottom of his report, French wrote, "Shield # 1010 belongs to P.O. James Curtis, who owns a Blue Camero [sic]."

## 3. December 4, 1978

By letter dated December 4, 1978 to Frank Kehr, Police Chief of the LPD ("Kehr"), one Kenneth A. Heller ("Heller") filed a "formal complaint" against "the officer in your command with badge number 1010." Heller stated that at 9:20 p.m., the officer was driving west at an excessive speed on a side street one block south of the intersection between Sunrise Highway and Broadway. Heller was traveling north on Broadway, approaching the intersection. The officer failed to stop at the posted stop sign, and had Heller not honked his horn, the officer would have collided with Heller. Heller continued driving and stopped at a red light at the intersection of Sunrise Highway and Broadway. The officer followed him at an excessive speed and stopped directly behind the rear bumper of Heller's car. The officer turned on his police lights and ordered Heller to pull to the side of the road. When the officer approached, Heller asked him whether there was a problem. The officer "became verbally obscene and abusive in language, and gesticulated in such a manner that I immediately became silent, fearing for my physical safety from this man." The officer issued a traffic violation, which Heller claimed was not justified.

## 4. April 16, 1981

In a letter to Kehr, dated April 16, 1981, the NCDA wrote that it had investigated allegations of false arrest and police brutality that had been filed by one Frederick Incorvaia against Curtis and his brother, Police Officer John Curtis. The NCDA informed Kehr that it had reviewed the evidence and had determined that a criminal prosecution of the officers was not warranted.

## 5. October 20, 1981

In a letter to Kehr dated October 20, 1981, an unnamed complainant describes an incident with Curtis. It appears that there may be a second page of the letter, which might identify the complainant by his or her signature, but the second page

is not included in Davis' exhibits. In any event, the complainant states that on October 10, 1981 at 12:05 a.m., Curtis directed him to pull his vehicle to the side of the road. Curtis informed the complainant that his dealer plate did not have a '81 sticker on it. The complainant gave Curtis his license and registration to demonstrate that the vehicle had been registered in 1981, a fact that Curtis verified on the computer system. The complainant's letter states that Curtis "became very nasty and abusive to me," at which point, the complainant asked "if there was anything I personally had done to him." Curtis responded by yelling at him and telling him that he did not have a picture on his chauffeur license. Curtis handed the complainant two tickets, one for failing to signal a right turn, and one for failing to have a picture on his license.

### 6. July 24, 1983

In a letter to "Chief Kiermier" dated July 24, 1983, one Nicholas Passeggio, an Auxiliary Police Officer, wrote that he had observed a car accident earlier that day. He stopped his car, assisted the driver, directed a passerby to telephone the police, ensured that the fluids leaking from the car were not gasoline, and directed traffic. Curtis was among the four or five police officers who arrived on the scene. Passeggio approached him and said, "It looks like you can handle this." Curtis asked for Passeggio's name and badge number and told him that they could handle it and to "get lost." Passeggio described Curtis as rude and obnoxious and opined that "action should be taken against Officer Curtis."

### 7. July 23, 1985

On July 23, 1985, the Village of Lynbrook received a document from one A. Anthony Miller ("Miller"), entitled, "In the Matter of the Claim of A. Anthony Miller against the Incorporated Village of Lynbrook, N.Y." In this document, Miller notifies the Mayor and the Clerk of the Village of Lynbrook that on April 27, 1985 at 9:30 a.m., Curtis arrested Miller pursuant to a warrant that Curtis had invalidly obtained. According to Miller, the crime either had not been committed or had not been committed in Lynbrook.

### 8. February 10, 1987

One of Davis' exhibits in support of his opposition papers is a letter dated February 10, 1987, from one Michael Axelrod ("Axelrod"), attorney for the Lynbrook P.B.A., to Shirley Moskowtiz, Village Clerk, regarding a case entitled, *Herman Langford v. Lynbrook P.O. James Curtis*, Civ. Action No. 86–3523 (Wexler, J.). In this letter, Axelrod requests the name of the Village's liability carrier, so that he could contact the carrier's attorney regarding representation issues.

### 9. August 2, 1988

In a letter dated August 2, 1988 to Chief Joseph Lauriano, the NCDA wrote that after completing its investigation into the allegations of police misconduct in regard to *People v. Raymond Jackson* and *People v. Ernest Jackson*, it had determined that criminal prosecution of the police officers in those matters was unwarranted.

### F. The Present Action

As noted above, Davis filed the complaint in this action on December 30, 1997. On September 20, 2001, Davis filed an amended complaint after having received permission from the Court to do so. Davis claims that Curtis unlawfully detained him and questioned him, used excessive force against him, and deprived him of his right to due process, in violation of the rights secured to him by the Fourth, Fifth,

Eighth, and Fourteenth Amendments to the United States Constitution. Davis alleges that the Lynbrook Defendants were responsible for the training, supervision, and discipline of Curtis but failed to fulfill this obligation in a manner that amounted to deliberate indifference to the rights of those who would come into contact with Curtis. Davis further contends that Neve had notice of allegations that Curtis was violating citizens' constitutional rights but failed to make any meaningful investigation into those allegations. In addition, Davis contends that by failing to take any action regarding Curtis' behavior, Neve and the LPD essentially condoned his conduct thus making it the LPD's standard operating procedure.

The Lynbrook Defendants move for summary judgment arguing that Curtis was not acting under color of state law when he encountered Davis on April 12, 1995. They further contend that the municipality cannot be liable for any alleged violation of Davis' constitutional rights because Davis has not established that the alleged violation was due to an official policy or custom of the Village or the LPD. The Lynbrook Defendants also argue that Neve cannot be found liable in his official capacity because he is entitled to qualified immunity and cannot be found liable in his individual capacity because he was not personally involved in any violation of Davis' constitutional rights.

## II. *DISCUSSION*

### A. The Rule 56.2 Notice

■ A district court cannot grant a motion for summary judgment in a case involving a *pro se* litigant unless (1) the court apprises the *pro se* litigant of the consequences of failing to respond to the motion, *see Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir.1994); (2) an opposing party has already provided the litigant with the req-

uisite notice, *see Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996); or (3) it is clear that the litigant understands "the nature and consequences of summary judgment," *see M.B. # 11072–054 v. Reish*, 119 F.3d 230, 232 (2d Cir.1997). *See Vital v. Interfaith Medical Center*, 168 F.3d 615, 620–21 (2d Cir.1999) (holding that the failure of the district court to apprise a *pro se* litigant of the consequences of failing to respond to a motion for summary judgment is grounds for reversal). To fulfill this duty, the United States District Courts for the Eastern and Southern Districts of New York adopted Local Rule 56.2 on September 23, 1999. *See* E.D.N.Y. Administrative Order 99–6 (citing *Vital*, 168 F.3d 615). Local Rule 56.2 provides, in relevant part:

> Any represented party moving for summary judgment against a party proceeding *pro se* shall serve and file as a separate document, together with the papers in support of the motion, a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" in the form indicated below.

The notice referred to in the rule advises the *pro se* litigant of the possibility that the complaint may be dismissed and informs the litigant that he or she must submit evidence countering the facts asserted by the defendant and raising issues of fact for trial.

■ The Lynbrook Defendants have included in their motion papers a separate document entitled, "Rule 56.2 Notice." The Court has reviewed the Rule 56.2 Notice submitted by the Lynbrook Defendants and finds that it is contains all of the language that appears in the sample notice provided in Local Rule 56.2. The Lynbrook Defendants also have attached to their Rule 56.2 Notice a photocopy of (1) the cover of a book containing the Fed. R.Civ.P., and (2) Rule 56 in its entirety.

Based on the foregoing, the Court finds that the defendants have satisfied the requirements of Local Rule 56.2, and the plaintiff has been apprised of the consequences of failing to respond to a motion for summary judgment.

## B. The Summary Judgment Standard

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2550, 91 L.Ed.2d 265 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "When the movant demonstrates through competent evidence that no material facts are genuinely in dispute, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed. R.Civ.P. 56(e)). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Id.* (internal quotations and citations omitted); *see Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (holding that the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation"). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994).

The existence of disputed facts that are not material to the issue at hand will not defeat summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of judgment." *Id.* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If there is evidence in the record, including affidavits, exhibits, interrogatory answers, and depositions, as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Lane v. New York State Electric & Gas Corp.,* 18 F.3d 172, 176 (2d Cir.1994); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991).

Notably, "[t]he trial court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to decid[e] them. Its duty, in short, is confined at this point to issue-finding, it does not extend to issue resolution." *Gallo v. Prudential Residential Servs. Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994); *see Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987) (holding that on a motion for summary judgment, the court "cannot try issues of fact; it can only

determine whether there are issues to be tried").

■ In making this determination, the Court is mindful that Davis' *pro se* status means that his submissions should be held " 'to less stringent standards than formal pleadings drafted by lawyers.' " *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir.1998). The Court recognizes that it must make reasonable allowances so that a *pro se* plaintiff does not forfeit rights by virtue of his lack of legal training. *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir.1983). Indeed, courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, the Court is also aware that *pro se* status " 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Traguth*, 710 F.2d at 95 (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir.1981)).

## C. Color of State Law

■ Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ..., subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party in an action at law.

In order to succeed in a Section 1983 action, a plaintiff must prove that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir.1994) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981)).

■ It is axiomatic that " 'under color of law means under pretense of law' and that 'acts of officers in the ambit of their personal pursuits are plainly excluded.' " *Pitchell*, 13 F.3d at 547–48. In determining whether an officer's actions were taken as part of a personal pursuit or under color of state law, a court must look beyond whether the officer was on or off-duty when the incident at issue occurred. *See Pitchell*, 13 F.3d at 548. The Court must consider the nature of the officer's conduct and the relationship of the conduct to the officer's official duties. *See Pitchell*, 13 F.3d at 548. Thus, "liability may be found where a police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department." *Pitchell*, 13 F.3d at 548; *see Bonsignore v. City of New York*, 683 F.2d 635, 638–39 (2d Cir. 1982) (holding that an off-duty police officer can be liable under Section 1983 for acts "committed in the performance of any actual or pretended duty").

■ Viewing all of the evidence in the light most favorable to Davis and drawing all reasonable inferences in his favor, the Court finds that a jury could rationally conclude that Curtis was acting under color of state law on April 12, 1995. This is so even though Curtis may have begun the evening acting "in the ambit of his personal pursuits." *Pitchell*, 13 F.3d at 548 (quoting *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945)). He dressed in civilian clothes and went to a local bar where he played darts

and drank alcohol for approximately four hours. However, the nature of Curtis' conduct changed when he encountered Davis. Angered by Davis' bright headlights, Curtis allowed Davis to pass and then, in essence, effectuated a traffic stop by repeatedly flashing his lights to notify Davis to pull over. Although Davis does not claim to have believed that Curtis was a police officer at this point, Davis' subjective reaction to Curtis' conduct is not relevant to determining whether Curtis was acting under color of state law. *Pitchell,* 13 F.3d at 548.

A reasonable jury could conclude that when Curtis pulled alongside Davis at the intersection of Ocean and Atlantic Avenues, he invoked "the real or apparent power of the police department," *Pitchell,* 13 F.3d at 548, by informing Davis that he was a police officer and flashing what appeared to be a badge. *See Pitchell,* 13 F.3d at 548 (stating that the relationship of the officer's conduct to the performance of his official duties is a factor in determining whether the officer was acting under color of state law). Similarly, a jury could find that when Curtis followed Davis into the parking lot of Tri–State Newspapers, directly after identifying himself as a police officer, he was in his role as a police officer, investigating Davis' conduct for possible criminal activity.

Moreover, a reasonable jury could rationally conclude that Curtis' actions in the parking lot, specifically, when he jumped out of his car, drew his firearm, pointed it at Davis and asked him, "[Y]ou think I'm a cop now?," were those of a person performing the actual or pretended duties of a police officer. Indeed, the jury could find that these actions are very similar to those of an arrest of a suspect a police officer believes is dangerous. That Curtis identified himself as a police officer and showed a badge to Perez and Morales would sup-

port this interpretation of his conduct. Curtis also asked Davis questions that police officers typically ask motorists during a traffic stop or suspects apprehended on the street: "Can I see some identification?"; "Where are going?"; and "Where do you work?" Viewing the evidence in the light most favorable to Davis, the Court finds that a reasonable jury could find that Curtis' conduct bore such similarity to the performance of a police officer's official duties that Curtis invoked the real or apparent power of the police department. *See Pitchell,* 13 F.3d at 548.

That Curtis may have been on partial or total disability leave at the time of the incident is not relevant to determining whether he was acting under color of state law, because a reasonable jury could have determined that he was invoking the apparent power of the police department or performing the pretended duty of a police officer. *See Pitchell,* 13 F.3d at 548; *Bonsignore,* 683 F.2d at 638–39. In addition, the Court is not persuaded by the Lynbrook Defendants' argument that Curtis' inebriation deprived him of the intent to act under color of state law. The Lynbrook Defendants offer no legal authority to support this argument and the Court, in its own independent research, could not find any. Indeed, the color-of-state-law analysis is an objective one that focuses on nature of the officer's conduct, *see Pitchell,* 13 F.3d at 548–49, not on his or her subjective intent. Further, even if Lynbrook Defendants' legal assertion were viable, the Court finds that whether Curtis was so drunk that he lacked the ability to form intent would be a genuine issue of material fact that would preclude summary judgment on the color-of-state-law issue.

In sum, the Lynbrook defendants motion for summary judgment on the ground that Curtis was not acting under color of state law is denied because, drawing all

reasonable inferences in favor of the plaintiff, a rational jury could conclude that Curtis was acting under color of state law.

### D. Section 1983 Liability Against the LPD

The LPD is an administrative arm of the Village of Lynbrook. Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued. *See Hall v. City of White Plains*, 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) (dismissing claim against the police department); *Polite v. Town of Clarkstown*, 60 F.Supp.2d 214, 216 (S.D.N.Y.1999); *Umhey v. County of Orange*, 957 F.Supp. 525, 530–31 (S.D.N.Y. 1997); *Wilson v. City of New York*, 800 F.Supp. 1098, 1101 (E.D.N.Y.1992). Therefore, the complaint must be dismissed as against the LPD.

### E. Section 1983 Liability Against the Municipality

Although Davis has not specifically named the Village of Lynbrook as a defendant, he has named the individual defendants in their official capacities. Davis is therefore deemed to have named the municipality as a defendant because "[t]he real party in interest in an official-capacity suit is the government entity and not the named official." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *see Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.1998) (suit brought against county Commissioner of Social Services, in his official capacity is equivalent to a suit against the county). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Bender v. Williamsport Area School District*, 475 U.S. 534, 544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).

In their memorandum of law, the Lynbrook Defendants state that they are addressing Davis' claims against Neve in his official capacity as claims against the Village of Lynbrook because an official capacity suit is equivalent to a suit against the entity of which the named defendants were employed at the time of the incident. Clearly, the municipality has received notice of the action and has responded. Accordingly, the Court will treat the official-capacity claims against Neve as claims against the Village of Lynbrook, and will direct the Clerk of the Court to amend the caption of the complaint to substitute the Village of Lynbrook for Neve in his official capacity and for the LPD.

Because a municipality can act only through its employees, the question of liability turns on whether it can be held liable for the unconstitutional acts of its employees. Municipal liability under Section 1983 cannot be based on a theory of *respondeat superior*. *See Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404–05, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691, 694, 98 S.Ct. 2018, 2036, 2038, 56 L.Ed.2d 611 (1978); *Jeffes v. Barnes*, 208 F.3d 49, 56–57 (2d Cir.2000); *DeCarlo*, 141 F.3d at 61. Rather, the plaintiff must show that the constitutional violation by a municipal employee resulted from a custom, policy, or practice of the municipality. *See Monell*, 436 U.S. at 694, 98 S.Ct. at 2036; *DeCarlo v. Fry*, 141 F.3d at 61; *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995). A plaintiff need not demonstrate that the municipality had a formal rule or regulation that cause the deprivation. *See Vann*, 72 F.3d at 1048;

*Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991).

A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation, or by showing that a policymaker indirectly caused the misconduct of a subordinate municipal employee. *See Monell*, 436 U.S. at 690, 98 S.Ct. 2018, 56 L.Ed.2d 611; *Jeffes*, 208 F.3d at 61. Liability based on indirect causation can be established by showing " 'acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity.' " *Jeffes*, 208 F.3d at 61 (citation omitted). A municipal policy or practice can also be inferred from a failure by policymakers to train their subordinates amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees. *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *De-Carlo*, 141 F.3d at 61; *Ricciuti*, 941 F.2d at 123.

A plaintiff can also prove such deliberate indifference by showing "that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that its agents were violating citizens' constitutional rights." *DeCarlo*, 141 F.3d at 61; *Vann*, 72 F.3d at 1049 (holding that a plaintiff "may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference"); *Ricciuti*, 941 F.2d at 123; *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983) ("[M]unicipal inaction such as the persistent failure to discipline subordinates who violated civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*.").

"The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993); *see also Batista*, 702 F.2d at 397. Similarly, "the simple recitation that there was a failure to train [supervise] municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury." *Dwares*, 985 F.2d at 100. He must produce "some evidence that policymakers were aware of a pattern of [unconstitutional conduct] but failed to [respond]." *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir.1992). In addition, an official policy, practice or custom cannot be inferred from a single incident alleged in a complaint against a municipal employee not vested with policymaking authority. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Dwares*, 985 F.2d at 100; *Ricciuti*, 941 F.2d at 123.

Davis claims that the Village of Lynbrook had a custom or policy that caused the violation of his constitutional rights because it had notice of charges that Curtis violated citizens' constitutional rights but failed to make a meaningful investigation into those claims. In support of his allegations, Davis refers to, and attaches as exhibits, documents that purportedly describe nine complaints regarding Curtis' behavior. Of those nine complaints or criticisms, three are irrelevant to Davis' claim. The July 24, 1983 letter from Passeggio simply describes Curtis as a rude and obnoxious police officer. It does not allege an illegal seizure, excessive force, or a deprivation of due process. The February 10, 1987 letter from Axelrod to Moskowitz only refers to a civil action,

filed in federal court, in which Curtis was named as a defendant. It does not describe the nature of the lawsuit, much less indicate that the plaintiff was asserting a violation of his constitutional rights. Third, there is no indication that the August 2, 1988 letter from the NCDA to Chief Joseph Lauriano relates to Curtis because it does not mention the officers whom the NCDA had investigated.

However, the Court finds that drawing all reasonable inferences in favor of Davis, a jury could rationally conclude that the six remaining letters of complaints and criticisms demonstrate an "obvious need for more or better supervision to protect against constitutional violations." *Vann*, 72 F.3d at 1049; *Fiacco v. City of Rensselaer*, 783 F.2d 319, 331 (2d Cir.1986). French's March 28, 1974 complaint describes an incident in which Curtis chased Mina in a car to Brooklyn, where he filed charges against Mina, which he subsequently dropped. On July 8, 1974, December 4, 1978, and October 20, 1981 citizens complained that Curtis conducted unwarranted and inappropriate traffic stops. On April 16, 1981, the LPD was notified that the NCDA had decided not to file criminal charges against Curtis based on allegations of police brutality and false arrest. On July 23, 1985, the Miller alleged that Curtis had improperly obtained a warrant for his arrest. All six of these complaints, letters, or reports were addressed to the Commanding Officer of the LPD, the Village of Lynbrook, or the Chief of the LPD and were placed in Curtis' personnel file. Viewing this documentary evidence in the light most favorable to Davis, the Court is of the view that a reasonable jury could infer from these repeated complaints an obvious need for more or better supervision to protect against constitutional violations. *See Vann*, 72 F.3d at 1049; *Fiacco*, 783 F.2d at 331.

The Court also finds that, drawing all reasonable inferences in favor of Davis, a jury could rationally conclude that the Village failed to conduct a meaningful investigation into any of the claims regarding Curtis' conduct. Initially, the Court notes that although Davis alleges that the LPD failed to investigate these complaints in a meaningful way, he does not supply any evidence in support of his position. Further, the March 28, 1974 report indicates that Tierney spoke with Curtis regarding his conduct and warned him that he could lose he job if he continued to behave in this manner. Nevertheless, whether Tierney's actions constitute a "meaningful attempt on the part of the municipality to investigate or to forestall further incidents," *Vann*, 72 F.3d at 1049, is a disputed and genuine issue of material fact that is more appropriately decided by the jury. Further, the absence of evidence describing the investigatory steps and disciplinary actions taken by the LPD might, in fact, demonstrate a failure to conduct meaningful investigations into repeated complaints regarding Curtis' conduct. The Court cannot deprive Davis of the opportunity to go forward simply because he cannot prove a negative. This is especially true given Davis' *pro se* status, the fact that he is incarcerated, and the lack of evidence submitted by the movants to show either that the LPD investigated the complaints and reports or that Curtis was ever disciplined for his conduct.

In sum, the Court finds that viewing the evidence in the light most favorable to the plaintiff a reasonable jury could find from six letters, reports, and complaints an obvious need for more or better supervision to protect against constitutional violations. *See Vann*, 72 F.3d at 1049. The Court also finds that the absence of evidence that these complaints were investigated could lead a reasonable jury to infer deliberate

indifference. *See Vann,* 72 F.3d at 1049. Put differently, the Lynbrook Defendants have failed to demonstrate "through competent evidence that no material facts are genuinely in dispute" in regard to Davis' claim of municipal liability based on deliberate indifference. *See Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990). Accordingly, their motion for summary judgment on that claim is denied.

## F. The Action Against Neve in His Official and Personal Capacities

■■■ Davis names Neve as a defendant in both his official and personal capacities. As noted above, the suit against Neve in his official capacity is the equivalent of a suit against the Village of Lynbrook. *See Hall,* 185 F.Supp.2d at 303; *Polite,* 60 F.Supp.2d at 216; *Umhey,* 957 F.Supp. at 530–31; *Wilson,* 800 F.Supp. at 1101. Therefore, because the Court has denied the Lynbrook Defendants' motion for summary judgment on the issue of municipal liability, their motion for summary judgment on the claims against Neve in his official capacity must be denied as well. *See generally, Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) (when claims against a municipality are dismissed, claims against the police officers in their official capacities should be dismissed also). In addition, although the Lynbrook Defendants move for summary judgment on qualified immunity grounds, this defense is unavailable in official capacity suits. *See Rodriguez v. Phillips,* 66 F.3d 470, 482 (2d Cir.1995); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1146–47 (2d Cir. 1995); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("[The] personal privilege[s] of absolute or qualified immunity ... are available to governmental officials only with respect to damage claims asserted against them in their individual capacities").

■■■ To establish the personal liability of an officer, a plaintiff must prove that he or she was personally involved in or responsible for the misconduct. *See Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001); *Woods v. Goord,* 2002 WL 731691 *6 (S.D.N.Y. Apr.23, 2002); *Timmins v. Toto,* 174 F.Supp.2d 56, 60–61 (S.D.N.Y.2001). The plaintiff can demonstrate the personal involvement of a supervisory official by showing any one of the following: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring." *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Applying these standards to the facts of this case, the Court finds that the plaintiff has failed to introduce evidence that Neve was personally involved in the constitutional violation.

■■■ Davis does not assert that Neve was present on the morning of April 12, 1995. Nor does Davis claim that he filed a formal complaint with Neve regarding Curtis' conduct, and that Neve failed to conduct a meaningful investigation of Davis' claims. Moreover, even had Davis made such a claim, the Court finds no merit in an assertion that Neve failed to remedy the wrong. Given the injury Curtis suffered to his brain, he will not serve as a police officer again, and thus, Neve could not remedy the wrong by disciplin-

ing, suspending, or firing Curtis. Davis also fails to submit any evidence showing that Neve was aware of the prior claims against Curtis or that other police officers committed wrongful acts, and that Neve was grossly negligent in supervising these officers. Although Davis' Section 1983 claim against the municipality has survived summary judgment, Davis fails to establish that Neve created or continued a custom or policy of deliberate indifference. All six of the complaints and criticisms about Davis' conduct were made prior to Neve's appointment as the chief of the LPD. Although these complaints and reports may have been in Curtis' personnel file, the plaintiff has presented no evidence that Neve knew about them. Hence, there is no evidence that he displayed deliberate indifference to Davis' rights by failing to act on information that Curtis was violating citizens' constitutional rights. As such, there is no evidence that Neve personally perpetuated a custom or policy of deliberate indifference.

That Neve had hired a private investigator to conduct surveillance of Davis' activities does not alter this conclusion. Trotter was hired to observe Curtis while he was at home, not while he was conducting arrests or traffic stops, which was the nature of the complaints regarding his conduct as a police officer. In addition, Neve hired Trotter in or about February 1995, when he withdrew his appeal for Curtis' disability pension, "[i]n light of recent medical evidence." The timing of the investigation and the fact that Trotter was watching Curtis at home indicate that Neve was trying to determine whether Curtis' application for a disability pension was fraudulent, not whether Curtis was violating citizens' constitutional rights.

In sum, the Court finds that based on the evidence presented, no reasonable jury could conclude that Neve was personally involved in the alleged violation of the plaintiff's constitutional rights. Accordingly, the Lynbrook Defendants' motion for summary judgment on the claims against Neve in his personal capacity is granted, and those claims are dismissed.

## III. *CONCLUSION*

Based on the foregoing, it is hereby

**ORDERED**, that the motion by the Lynbrook Defendants for summary judgment is **DENIED** in regard to the claims against the municipality; and it is further

**ORDERED**, that the motion by the Lynbrook Defendants for summary judgment is **GRANTED** in regard to the claims against Neve in his personal capacity, and those claims are dismissed; and it is further

**ORDERED**, that the Clerk of the Court is directed to amend the caption of the complaint to read as follows:

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CHARLES EDWARD DAVIS,

    Plaintiff,

  against

DETECTIVE JAMES CURTIS, individually and in his official capacity, and the VILLAGE OF LYNBROOK,

    Defendant.

and it is further

**ORDERED**, that the Court will hold a status conference via telephone conference call on October 9, 2002, and the attorneys for the defendants are directed to initiate and arrange the conference call, including notifying the facility in which the plaintiff is incarcerated; and it is further

**ORDERED**, that the parties are directed to appear on October 29, 2002 at 9:00 a.m. to select a jury.

**SO ORDERED.**