(February 19, 2009)

■ The People of the State of New York, Appellant, v Raheem Mayo, Respondent. [873 NYS2d 584]—

Order, Supreme Court, New York County (Laura A. Ward, J.), entered on or about April 19, 2007, which granted defendant's motion to dismiss counts two and three of the indictment charging, respectively, criminal possession of a controlled substance in the third degree (Penal Law § 220.16 [1]) and criminal possession of a controlled substance in the fourth degree (Penal Law § 220.09 [1]), reversed, on the law, the motion denied, and the counts reinstated.

The evidence before the grand jury was essentially as follows. At about 12:30 A.M. on December 28, 2006, Detective Payne and other police officers "closely followed" in "hot pursuit" a suspect in a crime, a man who had run into apartment 6 of a building in Brooklyn. After entering the apartment, a railroad flat with two adjoining bedrooms, Detective Payne moved past the living room and saw Leola Nimmons emerging from the back bedroom. Entering that bedroom, a "small" room that was approximately 8 feet by 10 feet, Detective Payne saw defendant putting on his pants; John Bosmond, defendant's father, was sitting on the bed. On a dresser in the bedroom, in plain view, was a clear bag holding 47 small lime green ziplock bags containing a white, rocky substance. Another adult, a woman, and three children were in the living room. One of the children, an 18-month-old, was defendant's child; the other two children were the children of a neighbor. The apartment was "filthy"; empty ziplock bags were in the kitchen and bathroom and "all over the place" in the living room. The empty ziplock bags differed from the lime green ones only with respect to their color; they were "brand new" and "ready for packaging."

In their brief, the People inexplicably state that the man who ran into the apartment was Clarence Saunders. However, the only witness who testified before the grand jury, Detective Payne, stated that two men were in the apartment, defendant and John Bosmond. Thus, from the evidence before the grand jury it is clear that the man who ran into the apartment was either defendant or Bosmond. Accordingly, the dissent errs in stating that "[t]here is no indication in the record whether this

man was arrested or even found in the apartment." As Detective Payne testified that defendant was putting his pants on when he entered the bedroom, it is reasonable to infer that Bosmond was the man who ran into the apartment. Our analysis, however, does not depend on that inference.

After defendant and Bosmond were taken out of the apartment, the police officers were talking about the Administration for Children's Services taking the children from the apartment on account of the drug paraphernalia, i.e., the empty glassine envelopes, in the living room. With that, Nimmons whispered to Detective Payne that she wanted to talk to him. She went on to say, "I know what you're here for" and, pointing to a spot on the floor of the bedroom, she stated, "It's on the floor right here." Under a pair of men's jeans were two plastic bags, each of which contained small ziplock bags. One of the bags contained 37 and the other contained 59 ziplock bags; each bag also contained a white rocky substance. The jeans completely covered the two plastic bags. In addition to the jeans, there were clothes all over the floor.[1]

The small ziplock bags inside the two plastic bags also were lime green in color. These 96 ziplock bags in the two plastic bags "matched" the 47 ziplock bags on the dresser in the same room. Subsequent field and laboratory testing revealed that the 143 ziplock bags contained cocaine with a net weight of at least one-eighth ounce and 11.7 grains. Nimmons was the legal tenant of the apartment and the girlfriend of defendant's father. When asked if he knew whether defendant or his father lived in the apartment, Detective Payne answered, "They do not." When she pointed to where the two plastic bags were on the floor, Nimmons did not say whose drugs they were.

The first count of the indictment charged defendant and his father with criminal possession of a controlled substance in the third degree (Penal Law § 220.16 [1]) for possessing the 47

---

1. The dissent's position on the question of who ran into the apartment relies on the inexplicable statement in the People's brief identifying that man as Clarence Saunders. First, the sufficiency of the evidence before the grand jury must be appraised solely on the basis of that evidence; the statement in the People's brief is not part of and conflicts with that evidence. For that reason, the statement is irrelevant albeit confounding, and it is equally irrelevant whether it in fact represents a mistake by the author of the People's brief. Surely, if the People's brief contained an extra-record statement clearly inculpating defendant, the dissent correctly would protest that it was irrelevant. Second, the dissent makes a mountain out of a proverbial molehill. As we expressly state, our analysis does not depend on the inference—reasonable though it is—the grand jury could have drawn that Bosmond was the man who ran into the apartment.

ziplock bags of cocaine in plain view on the dresser. This count was premised on the statutory room presumption, which provides that the presence of narcotics "in open view in a room, other than a public place, under circumstances evincing an intent to . . . package or otherwise prepare for sale such controlled substance is presumptive evidence of knowing possession thereof by each and every person in close proximity to such controlled substance" (Penal Law § 220.25 [2]). On the basis of this presumption, "the jury is authorized . . . to draw from presence of the defendants . . . the logical inference that they were guilty of criminal possession of narcotics" (*People v Daniels*, 37 NY2d 624, 631 [1975]). As the cocaine that is the subject of the second count, contained in the 96 ziplock bags in the two plastic bags, was not in open view but were under the jeans, the room presumption does not apply to that count. The grand jury nonetheless charged defendant and his father with possessing the 96 ziplock bags of cocaine. The question on this appeal is whether the People presented legally sufficient evidence that defendant was in constructive possession of the 96 ziplock bags. If so, the third count of the indictment—which alleges that defendant and his father possessed one eighth of an ounce or more of cocaine on account of the combined weight of all 143 ziplock bags—also is supported by legally sufficient evidence.

The controlling legal standards are clear. To establish constructive possession, "the People must show that the defendant exercised dominion or control over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized" (*People v Manini*, 79 NY2d 561, 573 [1992] [internal quotation marks omitted]). Legally sufficient evidence "means simply a prima facie case, not proof beyond a reasonable doubt" (*People v Swamp*, 84 NY2d 725, 730 [1995]). In determining the legal sufficiency of the evidence before the grand jury, "[t]he reviewing court must consider whether the evidence, viewed most favorably to the People, if unexplained and uncontradicted—and deferring all questions as to the weight or quality of the evidence—would warrant conviction" (*id.*). "That other, innocent inferences could possibly be drawn from the facts [presented] is irrelevant on this pleading stage inquiry, as long as the Grand Jury could rationally have drawn the guilty inference" (*People v Deegan*, 69 NY2d 976, 979 [1987]).

Pursuant to the room presumption, it unquestionably was reasonable for the grand jury to conclude that defendant possessed the 47 ziplock bags of cocaine in plain view on the dresser. On the evidence before it, the grand jury could rationally have

drawn the guilty inference that defendant also possessed the contents of the two plastic bags under the jeans. That inference is rational for numerous reasons. In the first place, the 96 ziplock bags of cocaine in the plastic bags under the jeans were the same green color as the 47 ziplock bags and defendant was in close proximity to the bags of cocaine under the jeans as well as the bags of cocaine on the dresser. The room, moreover, was a small one in the rear of the apartment and only defendant, his father and Nimmons were in the room. Thus, the universe of persons who might have dominion and control over the 96 ziplock bags under the jeans is quite small, as it comprised at most only four persons—the three adults in the bedroom and the woman in the living room. On these facts, we think it entirely rational to infer that the persons who possessed the 47 green ziplock bags of cocaine also possessed the 97 green ziplock bags of cocaine.

In addition, to the extent a reasonable inference can be drawn that Nimmons did not exercise dominion and control over the 96 ziplock bags, that would strengthen the inference that the other two persons in close proximity to the 96 ziplock bags did so. We think the grand jury rationally could infer that the person who alerted the police to the presence of the 96 ziplock bags of cocaine did not exercise dominion and control over them. That another inference could be drawn from the fact that Nimmons alerted the police to the additional cocaine is of no consequence (*see Deegan*, *supra*).

To be sure, Nimmons was the lessee of the apartment and Detective Payne testified that defendant and his father did not live in the apartment. Defendant's connection to the apartment, however, was far from tenuous. When the police entered the bedroom after midnight, defendant was putting on his pants, which is hardly typical conduct of a casual visitor. And, as noted, Nimmons was the girlfriend of defendant's father, and defendant's own young child was in the living room. Finally, the guilty inference is supported as well by the presence in the apartment of so many other "brand new" ziplock bags "ready for packaging."

The dissent untenably asserts that "the evidence before the grand jury showed no more than defendant's mere presence in an apartment where drugs were found." Defendant was in a small room in the apartment in close proximity not only to the 47 small ziplock bags containing cocaine that were in plain view, but to the 96 ziplock bags containing cocaine that were under a pair of men's jeans (not, contrary to the dissent, under other clothing as well). All 96 of the ziplock bags were of the same,

lime green color. The dissent essentially glosses over this important fact, stressing instead that the other ziplock bags, which it acknowledges were "strewn throughout the apartment," were of a different color. To the extent the dissent is of the view that the different color of the empty ziplock bags supports its position, we respectfully disagree and maintain that just the opposite is true.

Moreover, only defendant, his father and Nimmons were in the small bedroom. That defendant was not someone who had the misfortune to be passing through the apartment at the wrong time is an entirely reasonable inference that can be drawn from the evidence that the police entered the apartment at 12:30 A.M. and, as noted, the evidence that defendant was putting his pants on when the police entered into the bedroom. According to the dissent, however, the evidence "show[s] only that defendant's father was Nimmons's boyfriend—evidencing a legitimate explanation for his presence in the apartment—and that defendant happened to be present when the police entered." For the reasons stated, we think it clear the grand jury could have inferred much more.

The dissent does not take issue with our position that from the fact that Nimmons alerted the police to the additional 96 ziplock bags of cocaine, a reasonable inference can be drawn that she did not exercise dominion and control over that cocaine.[2] For this additional reason, we submit that the grand jury reasonably could have inferred that the persons who possessed the 47 ziplock bags of cocaine in the bedroom also possessed the 96 ziplock bags containing cocaine that were but a few feet away in the same bedroom.

The dissent stresses the absence of "scales, chemicals, razors with which to cut the cocaine, cash, or even surfaces or equipment covered with residue." But the absence of such evidence demonstrates only that the evidence before the grand jury was not so overwhelming as to preclude any dispute about its sufficiency. It hardly negates the reasonableness of the inference from all the evidence that was adduced before the grand jury that defendant also possessed the 96 ziplock bags. Regardless of whether "a drug operation [was] being run out of the apart-

---

2. Rather, the dissent wrongly asserts that the inference "could be used to ensnare even the young children in the apartment." Of course, however, defendant, Bosmond and Nimmons were the ones who were in close proximity to all 96 ziplock bags in the small, back bedroom, not the other adult and the three young children, who were elsewhere in the apartment. On this score, finally, we note that even if the young children were in that same bedroom, we hardly are committed to the proposition that it would be equally reasonable to infer that they constructively possessed all 143 green ziplock bags of cocaine.

ment," the dissent is not persuasive in brushing aside the evidence of empty ziplock bags—bags that were "brand new" and "ready for packaging"—in the kitchen and bathroom and "all over the place" in the living room. The fact remains that the apartment did contain paraphernalia and its presence throughout the apartment cannot reasonably be seen as helpful to defendant's position.

The dissent asserts that under our analysis "everyone within open view is also presumed to be a 'trusted member of the operation,' and, automatically, charged with knowing possession of hidden drugs as well as visible drugs." Our position does not depend on any such presumption, however plausible or implausible it may be, and our analysis dictates no such sweeping or automatic consequences. Rather, our position, like our analysis, is, as it must be, limited to the particular facts before the grand jury and the reasonable inferences that can be drawn from those facts, viewed in the light most favorable to the People (*People v Swamp*, 84 NY2d at 730). Concur—Friedman, J.P., McGuire and DeGrasse, JJ.

Acosta and Freedman, JJ., dissent in a memorandum by Acosta, J., as follows: I respectfully dissent because the majority extends the room presumption to drugs not in plain view. Given the absence of evidence that respondent exercised dominion and control over the apartment, this extension dangerously casts too wide a net of criminality.

On December 28, 2006, at 12:30 A.M., defendant was arrested in a Brooklyn apartment with John Bosmond and Leola Nimmons for allegedly possessing various quantities of drugs in Nimmons's apartment. Neither Bosmond or defendant lived there, although Bosmond was Nimmons's boyfriend and defendant's father. Several children, aged 18 months to 11 years old (including defendant's son), and another woman were in the living room when the police entered the apartment.

The arresting officer testified before the grand jury that he and other officers followed a man, who was a suspect in a crime, running into Nimmons's apartment. There is no indication in the record whether this man was arrested or even found in the apartment. The majority makes light of these facts by speculating that defendant or his father must have been the man who entered the apartment, although there is absolutely no evidence in the record to support this conclusion. Indeed, the People state in their brief that the man who was being pursued was a Clarence Saunders.

In the bedroom of the apartment the officers observed a clear plastic bag containing 47 green ziplock bags of a rocky substance,

later identified as crack cocaine, in plain view on the dresser. When the arresting officer went into the bedroom, Nimmons was coming out of the bedroom, Bosmond was sitting on the bed, and defendant was putting his pants on. The bedroom was a small room, about 8 feet by 10 feet and had clothes all over the floor.

The apartment was filthy, with empty ziplock bags (of a different color than those found on the dresser) in the kitchen and living room, and clothes and garbage strewn all over. There were no other packaging and no scales in the apartment.

After defendant and Bosmond had been taken out and the police were discussing taking the children to the Administration for Children's Services, Nimmons said "I want to talk to you" and then said "I know what you're here for. It's on the floor right there." At the spot she indicated, the bedroom floor, there were two more large ziplock bags completely covered with a pair of men's jeans; one bag contained 37 ziplock bags and the other contained 59 bags. The 96 ziplock bags were of the same color as the ziplock bags on the dresser, but different from the ones strewn throughout the apartment. The bags contained cocaine and the total weight of all three bags was one-eighth ounce and 11.7 grains. Based on the arresting officer's experience, the quantity of cocaine was consistent with sale, not personal use.

There was no evidence that the jeans under which the drugs were found—or any of the other clothes that were strewn all over the floor—belonged to defendant. Nor was there any evidence that defendant exercised, or had any right to exercise, any control over the premises. Notably, the apartment was leased to Nimmons, who was Bosmond's girlfriend, and there was no evidence before the grand jury as to how long they had been together or how often he spent the night there. Defendant, in turn, was Bosmond's son, and the testifying officer stated unequivocally that defendant did not live there.

The statutory "room" presumption does not apply to the hidden bags in this case because, by its terms, the presumption is limited to drugs in "open view." The majority nonetheless posits that since the drugs in plain view were packaged similarly to those hidden under the jeans and respondent was in close proximity to both, the grand jury could have inferred that respondent possessed the hidden drugs as well. The majority buttresses this inference by speculating that defendant or his father was the man running into the apartment although the evidence shows otherwise. To account for the lack of evidence, the majority speculates that the People simply made a mistake in their brief in "inexplicably" stating that the man who was being

pursued was Clarence Saunders. There are several problems with these assumptions. First, in the absence of evidence that defendant exercised dominion and control over the apartment, it criminalizes mere presence in an apartment with drugs. The Court of Appeals, however, has held that proof of the defendant's "mere presence" in an apartment that the defendant did not own, rent or occupy is insufficient to establish his dominion and control over drugs, guns or paraphernalia that were found in the apartment but were not in open view and therefore were not subject to the room presumption (*People v Headley*, 74 NY2d 858, 859 [1989], *affg* 143 AD2d 937 [1988] ["Proof that the premises were used for drug dealing was not sufficient to establish that defendant himself was guilty of unlawful drug and weapons possession"]; *see People v Pearson*, 75 NY2d 1001, 1002 [1990] [evidence legally insufficient to sustain conviction absent proof that defendant had any control or possessory interest in store or backroom where drugs were found, or "was involved in any drug selling or other operation being conducted there"]; *People v Gil*, 220 AD2d 328 [1995] [affirming dismissal of indictment where People presented nothing more than proof of defendant's presence]; *People v Dawkins*, 136 AD2d 726 [1988] [defendant could be charged with constructive possession of cocaine found in a bag under his feet, but not of 41 bags of marijuana found in another room]). These cases are consistent with the Legislature's policy choice to limit the room presumption—even in a drug factory—to drugs in close proximity *and* in open view.

Moreover, by relying on sheer speculation that defendant or his father was the person being pursued, and then layering that speculation on an inference that defendant possessed the drugs that were not in plain view because it can be presumed that he also possessed the drugs in plain view by virtue of the room presumption, the majority unfairly extends the room presumption beyond its intended limits. Notwithstanding the majority's insistence that its analysis does not depend on the inference that appellant may have been the man running into the apartment, its unsupported view of the facts clearly and unfairly support its conclusion.

The majority also states that the grand jury could have reasonably inferred that Nimmons, the lessee of the apartment, did not exercise dominion and control over the hidden drugs because she alerted the police to their presence. And, this inference, according to the majority, serves to strengthen the inference that defendant and his father constructively possessed the hidden drugs, heightened by their proximity to the drugs by virtue of

the small size of the bedroom. This logic, which could be used to ensnare even the young children in the apartment, actually highlights the dangers inherent in extending the room presumption and settled principles of law simply to add two more counts to the indictment. Of course, if Nimmons could have afforded a larger apartment, the inference against defendant would not be as strong under the majority's reasoning.

Rather, as the motion court correctly found, the evidence before the grand jury showed no more than defendant's mere presence in an apartment where drugs were found, and was plainly insufficient to establish his constructive possession of any of the hidden drugs found in Nimmons's bedroom. Nimmons was the lessee and there was nothing to show that defendant lived with her, or had free use of the premises, or had the key to the apartment giving him access. The grand jury minutes show only that defendant's father was Nimmons's boyfriend— evidencing a legitimate explanation for his presence in the apartment—and that defendant happened to be present when the police entered. This evidence does not support the theory that defendant constructively possessed the hidden drugs through the exercise of "dominion and control over the place where contraband was seized" (*People v Manini*, 79 NY2d 561, 572-573 [1992]).

Nor was there any evidence that defendant was involved in any drug packaging or selling operation conducted in the apartment that could be used to support his constructive possession of drugs that were not in plain view (*see Pearson*, 75 NY2d at 1002). In fact, the record contains no support for the People's assertion on appeal that the evidence established that the apartment served as a drug packaging facility.

Rather, there were drugs already packaged in the bedroom, some in plain view, some concealed by clothing on the floor, in quantities large enough to infer they were to be sold. But nothing indicative of a drug operation being run out of the apartment was discovered, such as scales, chemicals, razors with which to cut the cocaine, cash, or even surfaces or equipment covered with residue (*cf. e.g. People v Robinson*, 41 AD3d 317 [2007], *lv denied* 9 NY3d 925 [2007] [evidence showed that apartment being used as a drug factory, where it contained large quantities of narcotics, drug paraphernalia and cash, and permeated by a noxious chemical smell]; *People v Miranda*, 220 AD2d 218 [1995], *lv denied* 87 NY2d 849 [1995] [cocaine found near scale, wrapping materials and a calculator]).

Moreover, the apartment, although unkempt, was clearly being used as Nimmons's residence. Her bedroom had a bed and a

dresser, there were clothes there and in the living room, and there were an adult and several children on the premises who were obviously not involved in any illegal activity. This was clearly not a place where "only trusted members of the [narcotics] operation would be permitted to enter" (*People v Bundy*, 90 NY2d 918, 920 [1997]). Under these circumstances, the unspecified number of ziplock bags, all of a different color than those containing cocaine in the bedroom, was insufficient evidence of a drug factory given the absence of any other paraphernalia associated with drug packaging.

Under the majority's interpretation everyone within open view is also presumed to be a "trusted member of the operation," and, automatically, charged with knowing possession of hidden drugs as well as visible drugs. This is not only inconsistent with the Legislature's policy choice to limit the presumption to drugs in plain view, but it also may be a dangerous proposition to cast such a wide net capable of catching persons unconnected to the drug operation in question. Accordingly, I respectfully dissent.