Elijah JACKSON, by and through his Parent and Legal Guardian, Julie Jackson, and Julie JACKSON, Individually, Plaintiffs,

v.

SUFFOLK COUNTY, et al., Defendants.

No. 13–CV–394 (JFB)(SIL).

United States District Court, E.D. New York.

Signed Feb. 20, 2015.

Alex Kriegsman, Kriegsman PC, Sag Harbor, NY, for Plaintiffs.

Frank A. Isner, Daniel P. Barker, and Jean K. Delisle of Smith, Finkelstein, Lundberg, Isler & Yakaboski, LLP, Riverhead, NY, for Southold Defendants.

Dennis M. Brown, Suffolk County Attorney, by Jason Bassett, Assistant County Attorney, Office of the County Attorney, Hauppague, NY, for County Defendants.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

On June 3, 2011, the East End Drug Task Force (the "Task Force"), including defendant Police Officer Kenneth D. Richert ("Richert"), executed a search warrant at 115 Broad Street, Greenport, New York, the residence (at that time) of plaintiff Julie Jackson ("Jackson"); her son, plaintiff Elijah Jackson ("Elijah") (collec-

tively, "plaintiffs"); and Jackson's husband, nonparty Jeffrey Jackson ("Jeffrey"). On February 17, 2012, the Task Force executed a search warrant at 8100 Main Street, East Marion, New York, the Jacksons' residence (at that time). During the second search, officers discovered cocaine and marijuana in the pocket of a jacket in a dining room closet, and arrested and charged Jackson and her husband with Criminal Possession of a Controlled Substance in the Fifth Degree, N.Y. Penal Law § 220.06(5), and Unlawful Possession of Marijuana, N.Y. Penal Law § 221.05. This lawsuit concerns the execution of those searches, Jackson's arrest, and her subsequent prosecution.

In this 42 U.S.C. § 1983 action, plaintiffs allege that the "County Defendants"—Suffolk County ("the County"), the Suffolk County District Attorney's Office ("the District Attorney's Office"), the Task Force, and Richert—and the "Southold Defendants"—the Town of Southold ("Southold") and the Southold Police Department ("SPD")—violated plaintiffs' Fourth Amendment rights to be free from false arrest, malicious prosecution, malicious abuse of process, false imprisonment, and unlawful search and seizure, and also violated their Fourteenth Amendment equal protection rights. Plaintiffs also seek to hold the County and Southold liable under *Monell.* Presently before the Court are the County Defendants' and the Southold Defendants' respective motions

for summary judgment pursuant to Fed. R.Civ.P. 56. For the following reasons, the County Defendants' motion is granted in part and denied in part, and the Southold Defendants' motion is granted in its entirety.[1]

In particular, the Court concludes that Jackson's unlawful search claim against Richert (relating to the June 3, 2011 search) survives summary judgment, because there is a genuine issue of disputed fact as to whether the search was executed in an unreasonable manner, in terms of the alleged gratuitous and unnecessary destruction of property during the search. Although defendants argue that the damage was incidental to the lawful search, the Court concludes that this issue cannot be decided on summary judgment in this case given the factual disputes in the record concerning the nature and scope of the items damaged, as well as alleged threats during the search regarding the destruction of property and other circumstances surrounding the search. Moreover, when the evidence is construed most favorably to plaintiffs, there is sufficient evidence of Richert's involvement with and/or coordination of the execution of the search to create a genuine factual dispute as to whether he was personally involved in the alleged destruction of property, or failed to intervene in the destruction of property by other officers. In addition, given these disputed issues of fact, qualified immunity on this claim cannot be decided at this junc-

---

1. Plaintiffs did not contest the County Defendants' argument that the Task Force is within the District Attorney's Office, an administrative arm of the County that is not amenable to suit (County Defs.' Mem., at 1–2 (citing *Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002))), and the Southold Defendants' argument that SPD cannot be sued for similar reasons (Southold Defs. Mem., at 20–21.) Accordingly, the Court dismisses the claims against the Task Force, the District Attorney's Office, and the SPD. *See, e.g.,*

*Davis,* 224 F.Supp.2d at 477 (dismissing complaint as against Lynbrook Police Department because it is administrative arm of municipality); *see also Maher v. Alliance Mortg. Banking Corp.,* 650 F.Supp.2d 249, 267–68 (E.D.N.Y.2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal quotation marks omitted)).

ture. In other words, if Richert maliciously and/or gratuitously destroyed Jackson's property during the search with no legitimate law enforcement reason (as plaintiffs assert), he would not be entitled to qualified immunity.

However, summary judgment is warranted on all the other claims. First, no independent substantive due process claim exists because the Fourth Amendment provides the source for a claim under Section 1983 for all of the alleged conduct. Second, the uncontroverted evidence demonstrates that there was, at a minimum, arguable probable cause to arrest Jackson under a theory of constructive possession for the drugs found during the search and, thus, the false arrest and imprisonment claim cannot survive summary judgment against Richert because he is entitled to qualified immunity. Third, plaintiffs point to no evidence that vitiated the probable cause during the prosecution and, thus, Richert is also entitled to qualified immunity on the malicious prosecution claim. Fourth, the malicious abuse of process claim cannot survive summary judgment because there is no evidence from which a rational jury could find a collateral objective by Richert and, in any event, Richert is entitled to qualified immunity. Fifth, the equal protection claim cannot survive summary judgment because, *inter alia*, there is insufficient evidence from which a rational jury could find that any racial or other discriminatory animus motivated Richert's (or any other officer's) actions. Finally, there is no evidence that a municipal policy, custom, or failure to train caused any injury and, thus, the municipal liability claims against the County and the Town of Southold cannot survive summary judgment.

## I. BACKGROUND

### A. *Facts*

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmoving party. *See, e.g., Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it. Although the parties' Rule 56.1 statements of facts contain specific citations to the record, the Court cites to the Rule 56.1 statement instead of the underlying citation to the record.

### 1. The Task Force

The East End Drug Task Force is a multi-jurisdictional task force funded by the District Attorney's Office. (Southold Defs.' 56.1 ¶ 1.) The parties dispute whether Richert, a SPD Officer, was under the Task Force's exclusive control, command, and supervision while he was assigned to it from June 2010 to July 2013, such that Southold cannot be municipally liable in this case regardless of Richert's potential liability.

According to the Southold Defendants, from on or about June 1, 2010, through August 1, 2011, Richert was supervised by and reported to Suffolk County Senior Investigator James McAllister ("McAllister"), and James Rodden ("Rodden") of the Task Force. (*Id.* ¶ 4.) From on or about August 1, 2011, through July 1, 2013, Richert was supervised by, and reported to, Suffolk County Senior Investigator Robert Flood, Rodden, and Senior Probation Officer Gil Maldonado ("Maldonado") of the Task Force. (*Id.* ¶ 5.) Plaintiffs argue that Richert, who they claim led the searches at issue, was wearing an SPD badge, was paid by Southold, and was

reporting his actions to SPD Detective John Sinning ("Sinning"), the Task Force's SPD liaison. (*E.g.*, Pls.' 56.1 ¶¶ 2, 4.) Richert testified that (1) his salary was paid by Southold, but the District Attorney's Office compensated for overtime; (2) while he worked for the Task Force, a plain-clothes unit, he would wear his SPD shield; (3) officers wore jackets that said East End Task Force; and (4) he told Sinning the Task Force was conducting an operation in Southold on June 3, 2011, and to come to the scene. (Richert Dep. at 15, 29–30, 36.) Contrary to plaintiffs' assertion, Richert did not testify that he reported his actions "as they occurred" to Sinning. Sinning was present during the search, and he stated he took direction from and was under the exclusive command and supervision of the Task Force. (Southold Defs.' 56.1 ¶ 8.)

### 2. The June 3, 2011 Search

On June 2, 2011, Richert obtained a search warrant on behalf of the Task Force for the Jacksons' home at 115 Broad Street. (*Id.* ¶ 24.) Suffolk County Court Judge James Doyle issued the warrant, which, per an affidavit from Richert, stemmed from Jeffrey's sales of cocaine to an undercover informant on two prior occasions. (*Id.* ¶¶ 25, 26; *see* June 3, 2011 Search Warrant, Southold Defs.' Ex. K.) Judge Doyle found probable cause to search for cocaine, currency, books and records reflecting illicit drug transactions, drug paraphernalia, and indicia of knowing possession, ownership, and/or control of the contraband and premises. (Southold Defs.' 56.1 ¶ 28.)

The Suffolk County Police Emergency Services ("SCPES") and the Task Force, supervised by McAllister, executed the warrant on June 3, 2011. (*Id.* ¶¶ 9–10.) According to Richert, SCPES would "actu-ally execute the search warrant, make the building or residence or whatever we have the warrant for the safe place," and then Task Force officers would "do the search, actual searching." (Richert Dep. at 19–20.) When asked whether he led the search, Richert stated that "[t]he bosses [McAllister, and Sinning for SPD] are in charge. I tell them what I think, I think we should do this or go here, you know, we keep the bosses abreast of what's going on through the whole investigation." (*Id.* at 38.) Then, the searching officers "usually divide up the house and have partners or groups of people search room by room." (*Id.* at 39.) Because Richert procured the warrant, he assisted in coordinating the officers' assignments. (*See id.* at 43.) He did not remember what rooms he searched. (*Id.*) During the search, officers found marijuana in the pocket of a jacket in a basement closet, illegal drugs in a wall clock, cash, a digital scale, a handgun holster, and a shotgun. (Southold Defs.' 56.1 ¶ 56.) Jeffrey also gave a written statement to Richert admitting that he had been dealing illegal drugs for two years and that any drugs found in the house during the search belonged to him. (*Id.* ¶ 57.) The Task Force arrested Jeffrey and charged him with drug possession with intent to sell. (*Id.* ¶ 59.) Plaintiffs were not arrested. (*Id.* ¶ 60.) Plaintiffs allege, among other things, that the Task Force unreasonably destroyed and handled property during the search, and made improper comments to Jackson.

After entering the residence to conduct the search, SCPES immediately hand-cuffed the Jacksons.[2] (Southold Defs.' 56.1 ¶¶ 11–13, 29–30.) Richert testified that it is possible Jackson was in her underwear when SCPES entered, but she was wear-

---

**2.** Sinning assisted in searching Elijah's bedroom. (Southold Defs.' 56.1 ¶ 14.) He did not destroy or damage any property during his search. (*Id.* ¶ 37.)

ing pajamas or a nightgown during the search. (Richert Dep. at 41.) He did not recall seeing Jackson wearing only underwear. (*Id.* at 42.) Jackson was detained inside during the duration of the search. (*Id.*) She testified that, when the search began, she was wearing a T-shirt and underwear. (Jackson Dep. at 34, 40.) After she was led to a room with her husband, Jackson asked for help getting dressed. (*Id.* at 54.) An officer responded that a female would come help Jackson; that officer arrived twenty or thirty minutes later. (*Id.* at 54, 64.) Elijah, meanwhile, was handcuffed for about ten minutes. (Southold Defs.' 56.1 ¶ 29.) After he was released, Elijah dressed himself, got his backpack, and called his aunt. (*Id.* ¶ 31.) He was escorted from the house, and his aunt picked him up approximately ten minutes later. (*Id.* ¶¶ 32–33.) Elijah never witnessed the search, and none of his personal belongings were destroyed or damaged.[3] (*Id.* ¶¶ 34, 36.)

Richert testified that he would describe the officers' conduct during the search as professional and consistent with the training he had received. (Richert Dep. at 43–44.) He testified that nothing was intentionally broken or destroyed (at least without a particular reason, such as when a drug-detecting dog mistakenly indicated that a cooler belonging to the Jacksons contained drugs, and officers ripped it open). (*Id.* at 44–45.) He did not remember anyone throwing food into the driveway, breaking glass, or scratching antique bowls. (*Id.* at 45–46.) He testified that he did not see anyone wearing Jeffrey's motorcycle gear, did not wear Jeffrey's clothing, did not rip up a mortgage application or throw mortgage papers on the floor, did not laugh after being told the Jacksons were applying for a mortgage, and did not suggest they would not qualify for a mortgage. (Southold Defs.' 56.1 ¶¶ 41–44.) According to Richett, he also did not believe that they were receiving Section 8 housing assistance, nor did he ask the Jacksons whether they were, or suggest that they were receiving such assistance.[4] (*Id.* ¶¶ 39–40; *see also* Richert Dep. at 59 ("The fact that they were black did not lead me in any way to believe or not believe that they were on Section 8.").) Richert thought Jackson came "from a good, local family"; that she was not a suspect because he did not "think anything

---

3. As a threshold matter, Elijah did not testify that he suffered emotional or physical injuries because of the search. (*See* Southold Defs.' 56.1 ¶ 61.) Plaintiffs purport to dispute this fact because Carolyn Peabody, Elijah's "treating therapist," "will testify that he suffered emotional injuries." (Pls.' 56.1 ¶ 60.) Plaintiffs have not introduced her testimony into the record, and their unsupported assertion, therefore, cannot create a genuine issue of material fact, particularly in light of Elijah's absence during the search. Elijah even testified that, after the search, he did not see any mental health professional or have any problems "in terms of fears, panics, nightmares, things of that nature." (Elijah Dep. at 52–53.) When asked what the "emotional harm has been" to him from both searches, he stated, "Mostly just, just, I just really feel, felt bad for my mother for what she went through, there wasn't really, there wasn't

really much that happened to me, I wasn't there." (*Id.* at 95.) In any event, as discussed *supra*, the only portion of this claim that survives summary judgment is the purported damage to Jackson's property. There is no remaining claim as to the legality of the entry into the residence, or any claim that Elijah's property was destroyed. Thus, given there is no evidence from which a rational jury could find that Elijah's constitutional rights were violated, he can have no claim for emotional harm from the search.

4. Section 8 provides rental subsidies to eligible applicants. *See Subsidized Rental Opportunities*, Suffolk County Government, http://www.suffolkcountyny.gov/Departments/EconomicDevelopmentandPlanning/Housing AffordableandWorkforce/Renters/Subsidized RentalOpportunities.

that we found in the house was gonna belong to Julie"; and that the home was "nice, well kept, clean." [5] (Richert Dep. at 52–54.)

Jackson, on the other hand, testified that officers, including Richert, "just started destroying things" during the search. (Jackson Dep. at 96.) She claims she saw officers moving Jeffrey's clothes (*id.*); put on his motorcycle jacket and a hat (*id.* at 97); and take pictures of the person wearing the coat (*id.* at 99–100).[6] She testified that an officer asked her whether she owned the home; asked if she was on Section 8; said that she would lose Section 8 if she had it; and, in response to Jackson's question as to why he thought she was on Section 8, said, "Most of you are." (*Id.* at 102.) Jackson interpreted that to mean black people, although the officer did not actually use racially derogatory terms or epithets. (*Id.* at 102–03, 129–30 (stating that only "racist language" was remarks about being on public assistance).) This officer was not Richert, but another individual. (*Id.* at 103.) Jackson also testified to the following:

(1) Her kitchen was "totally destroyed," with cabinet doors broken, drawers removed and broken in half, and food strewn on the floor.

(2) Officers tore apart the living room, furniture was flipped upside down with the bottoms cut out, and a room divider was ripped in half.

(3) Jeffrey's clothes were in a bathtub.

(4) In the finished basement, carpeting was ripped up, furniture was flipped upside down and cut open, a big screen TV was on the floor (undamaged), and doors were off their hinges.

(5) Ceramic bowls and other items were broken in half and thrown out in the driveway, and glass frames were broken.

(6) An unidentified officer saw Jackson's mortgage application and told her, "Your mortgage will never happen anyway, that's never gonna happen." (Jackson thought the officer said this because she is black, although the officer did not reference her race in any specific way.)

(*Id.* at 105, 116, 124–28, 138–39.)

Plaintiffs also assert that, on July 22, 2011, Jeffrey's attorney wrote to SPD complaining about the search. (Opp'n, at 4.) This letter is not in evidence. Richert testified that he was told there was a complaint, but he "was never told exactly what happened or what it was over." (Richert Dep. at 60.) Sinning also was not aware of the particulars of such a complaint. (Sinning Dep. at 59–60, 67–68

**5.** Sinning also testified that he did not wear Jeffrey's clothing, or mock Jeffrey, or dance during the search, or see anyone wear Jeffrey's clothing or motorcycle gear, or mock Jeffrey, dance, rip up a mortgage application, believe or suggest or ask whether the Jacksons were receiving Section 8 assistance, or hear anyone ask Jackson if she was receiving Section 8 assistance. (Southold Defs.' 56.1 ¶¶ 45–54.)

**6.** Suffolk County Deputy Sheriff Investigator Guy Valerioti ("Valerioti"), a member of the Task Force, photographed the search. (Southold Defs.' 56.1 ¶¶ 15–16.) Defendants assert that all photographs were for the sole purpose

of recording evidence and documenting the search. (*Id.* ¶ 17; *see, e.g.*, Richert Dep. at 48 (testifying that, to his knowledge, no personal photographs were taken for purposes other than recording evidence or documenting what was done in the search).) Valerioti's photographs, however, are not in evidence. Exhibit B to the County Defendants' motion is photographs taken by plaintiffs, which depict shattered ceramic bowls, overturned bricks, broken tables and doors, broken coat hangers, overturned and torn furniture, the opened cooler, strewn objects, and other items. (*See also* Jackson Dep. at 263–305.)

(stating that he heard an attorney made a complaint).)

### 3. The February 17, 2012 Search

After his release, Jeffery sold cocaine to an undercover informant on two more occasions before the February 2012 search. (Southold Defs.' 56.1 ¶ 61.) On February 15, 2012, Richert obtained a search warrant on behalf of the Task Force for the Jacksons' home at 8100 Main Street. (*Id.* ¶ 62; *see* February 17, 2012 Search Warrant, Southold Defs. Ex. O.) The court found probable cause to search for cocaine, currency, books and records reflecting illicit drug transactions, drug paraphernalia, and indicia of knowing possession, ownership and/or control of the contraband and premises. (Southold Defs.' 56.1 ¶¶ 63–64.)

SCPES executed this warrant, and the officers reported to Flood and Maldonado. (*Id.* ¶¶ 19–20.) Sinning was not present, and he was unfamiliar with the search. (Sinning Dep. at 60, 71–72.) Southampton Town Police Officer Steven Rios found marijuana and cocaine in the pocket of a jacket hanging in a closet in the dining room. (Southold Defs.' 56.1 ¶¶ 72, 74.) Jeffrey did not admit that the drugs belonged to him. (*Id.* ¶ 75.) The Task Force then arrested both Jackson and her husband.[7] (*Id.* ¶ 23.) Richert processed and charged Jackson. (Richert Dep. at 78.)

The parties dispute the propriety of Jackson's arrest. Plaintiffs assert that Richert testified that he knew nothing the officers would find would belong to Jackson. (*E.g.* Pls.' 56.1 ¶ 74.) Richert, however, testified that he did not "believe" Jackson to be a suspect and that he did not believe he would find anything, as far as contraband, belonging to her in the

house. (Richert Dep. at 83.) He also stated, "I believe it could have just as easily been hers as it could have been his. The first time I arrested him from the June search warrant he openly admitted that the drugs were his in the house and he did not openly, he would not say the drugs were his this time." (*Id.* at 85.) Richert did not know whose jacket it was. (*Id.* at 74.)

### 4. Training

Richert and Sinning attended the Suffolk County Police Academy ("SCPA"), which trains officers on, *inter alia*, the proper method for executing search warrants; citizens' constitutional rights (including those related to search and seizure); and diversity, sensitivity, and law enforcement's relationship to minority communities. (*Id.* ¶¶ 77, 80–81, 84–85, 88–89.) Richert explained that Southold does not have its own search warrant or Emergency Services team, and he learned the basics of search warrants from the SCPA and SPD's procedures while on the job. (*See* Richert Dep. at 18.) He received no official training from SPD about executing search warrants or racial sensitivity. (*Id.* at 19, 23.) The Task Force also provided no formal training on the initial execution of a search warrant (the activities by SCPES). (*Id.*) Instead, officers were assigned to a more seasoned individual and "you kind of stayed by their side until you found your way as to how to search, what you were allowed to do and how to handle yourself." (*Id.* at 20.) Sinning testified that he received training in legal aspects for search warrants from the District Attorney's Office, took an advanced criminal investigation course, was trained in diver-

---

7. Elijah was not handcuffed; instead, he was escorted from the premises ten minutes after SCPES entered, and his cousin picked him up. (Southold Defs.' 56.1 ¶¶ 66–67.) Elijah has not claimed any emotional or physical injuries stemming from the search, none of his belongings were damaged, and he did not witness the search. (*Id.* ¶¶ 69–70.)

sity at SCPA, and attended bias presentations.[8] (Southold Defs.' 56.1 ¶¶ 87, 89–91.)

### B. *Procedural History*

Plaintiff filed the original complaint in this action on January 23, 2013, and the amended complaint on April 11, 2013. The Southold Defendants answered on May 2, 2013, and the County Defendants answered on May 3, 2013. Defendants filed their respective motions for summary judgment on May 28, 2014; plaintiffs filed their opposition on July 1, 2014; and defendants filed their respective replies on July 14, 2014. The Court heard oral argument on September 3, 2014. On September 10, 2014, plaintiffs submitted a letter to address an issue the Court had raised at oral argument. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir.2013). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir.2004)

(quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d

---

**8.** Plaintiffs contend this fact is disputed because Sinning testified that he was the subject of a federal lawsuit alleging mistreatment of a black man, but did not receive any diversity training in response. (Pls.' 56.1 ¶¶ 87–91.) The testimony, however, does not reveal the outcome or circumstances of that lawsuit.

Cir.1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993). Here, plaintiffs bring claims for (1) violations of their Fourteenth Amendment rights to due process and equal protection; (2) the false arrest and imprisonment of Jackson; (3) the malicious prosecution of Jackson; (4) the malicious abuse of process against Jackson; (5) unlawful search and seizure; ·and (6) municipal liability. The Court addresses each claim in turn.

■■■ As an initial matter, a "substantive due process analysis is not available where a more specific constitutional standard is directly applicable." *Hickey v. City of New York*, No. 01 Civ. 6506(GEL), 2004 WL 2724079, at *18 (S.D.N.Y. Nov. 29, 2004) (citing *Graham v. Connor*, 490 U.S. 386, 394–395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that where a particular constitutional amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims)). Because the Fourth Amendment provides the source for a claim under Section 1983 premised upon an allegedly false arrest, false imprisonment, or malicious prosecution, plaintiffs cannot state a substantive due process claim against defendants based on such conduct. *See Murphy v. Lynn*, 118 F.3d

938, 944 (2d Cir.1997); *Mayer v. City of New Rochelle*, No. 01 Civ. 4443(MBM), 2003 WL 21222515, at *8 (S.D.N.Y. May 27, 2003) (holding that a § 1983 claim of malicious prosecution without probable cause may not be based upon a denial of due process rights, but only upon denial of Fourth Amendment rights); *cf. Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (holding that substantive due process analysis would be inappropriate if respondents' claim were "covered by" Fourth Amendment).. Further, "the touchstone of due process is protection of the individual against arbitrary action of government." 523 U.S. at 845, 118 S.Ct. 1708 (internal quotation marks, alteration, and citation omitted). A substantive due process claim is only viable where the government conduct of which the plaintiff complains "shocks the conscience[,]" "violates the decencies of civilized conduct[,]" and was "intended to injure in some way unjustifiable by any government interest[.]" *Id.* at 846, 849, 118 S.Ct. 1708 (citations omitted). In this case, defendants' allegedly unreasonable search of plaintiffs' home and the circumstances of Jackson's arrest and prosecution are covered under the Fourth Amendment protections against unlawful search and seizure, false arrest, and malicious prosecution. Thus, "[a]ny arguments that defendants discharged their discretionary duties without legal justification in such an outrageously arbitrary way as to constitute a gross abuse of governmental authority may not be based on a denial of due process rights." *Conte v. Cnty. of Nassau*, No. 06–CV–4746 (JFB)(ETB), 2008 WL 905879, at *12 n. 4 (E.D.N.Y. Mar. 31, 2008).

■■ Moreover, "the use of vile and abusive language, no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim." *Keyes v. City of*

*Albany,* 594 F.Supp. 1147, 1155 (N.D.N.Y. 1984); *see, e.g., Miro v. City of New York,* No. 95 Civ. 4331(TPG), 2002 WL 1163580, at *5 (S.D.N.Y. June 3, 2002) ("An arresting officer's use of racial epithets does not constitute a basis for a § 1983 claim."); *Patton v. Przybylski,* No. 85 C 10044, 1986 WL 6088, at *2 (N.D.Ill. May 15, 1986) (claim of verbal abuse by police officers who allegedly made derogatory and insulting racial comments during arrest does not rise to level of constitutional deprivation), *aff'd,* 822 F.2d 697 (7th Cir.1987). "Only in rare circumstances in which the threats involved were inspired by malice rather than merely careless or unwise zeal so that they amount to an abuse of official power that shocks the conscience have courts recognized exceptions to this rule." *Brown v. Catella,* No. 1:08–cv–201–jgm, 2010 WL 2990834, at *4 (D.Vt. July 26, 2010) (quoting *Mroz v. City of Tonawanda,* 999 F.Supp. 436, 465 (W.D.N.Y.1998)) (internal quotation marks and brackets omitted). Thus, any alleged statements by an unidentified officer, which plaintiffs believe was based on race, does not, by itself, constitute a separate constitutional viola-

tion. In short, there is "no available constitutional remedy" for the statements by the unidentified officer under the circumstances of this case. *Id.* at *5 (quoting *Woods v. Valentino,* 511 F.Supp.2d 1263, 1285 (M.D.Fla.2007)). Of course, such alleged statements can be considered in connection with other claims, including the plaintiff's attempt to prove malice as to certain other constitutional claims. Accordingly, the Court grants summary judgment to defendants on plaintiffs' substantive due process claim.[9]

### A. Unlawful Search on June 3, 2011

Defendants move for summary judgment on the unlawful search and seizure claim against them on the grounds that they had probable cause to search and that they lawfully executed the search. Plaintiffs do not dispute that the Task Force had probable cause to search the home or that the warrant was valid, but argue that the manner and scope of the search was improper. Specifically, they contend that summary judgment is inappropriate because Jackson was left handcuffed in her

---

**9.** In the alternative, the Court concludes that Richert is entitled to summary judgment on this claim on qualified immunity grounds. According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003). In particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at the summary judgment stage "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly

established right.' " *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) (quoting *Williams v. Greifinger,* 97 F.3d 699, 703 (2d Cir.1996)); *see also Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (citations and quotation marks omitted)). Here, "[g]iven the state of the law in this area, it cannot be said that the defendants violated [Jackson's] clearly established constitutional right to substantive due process. Indeed, the case law indicates the unwillingness of courts across the country to find a due process violation where an arresting officer, or other public official, uses offensive or threatening language." *Brown,* 2010 WL 2990834, at *6. Accordingly, the Court also concludes that Richert is entitled to qualified immunity on the substantive due process claim.

underwear and waited for thirty minutes before she could get dressed, she was not a suspect, and the officers' comments during the search and destruction of property were excessive.

 "The reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out, whether pursuant to a warrant or under 'exigent circumstances.' " *Ochoa v. City of W. Haven,* No. 3:08–cv–00024(DJS), 2011 WL 3267705, at *6 (D.Conn. July 29, 2011) (citation and internal quotation marks omitted). "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits not subject to suppression." *Id.* (citation and internal quotation marks omitted). The plaintiff must establish "that the officers' actions were unreasonable or malicious, and that more than ordinary disarray and damage incident to the execution of the warrant" or search occurred. *Kirkland v. City of New York,* No. 06 CV 0331(NG)(CLP), 2007 WL 1541367, at *7 (E.D.N.Y. May 25, 2007); *see also Cody v. Mello,* 59 F.3d 13, 16 (2d Cir.1995); *Bender v. Alvarez,* No. 06–CV–3378, 2009 WL 112716, at *7 (E.D.N.Y Jan. 16, 2009) (granting summary judgment where plaintiff alleged items were thrown on ground and did not demonstrate defendants wantonly damaged or destroyed property).

 First, even though Richert believed that Jackson was not a suspect, it was not unreasonable, in the interest of safety, for the officers to detain and handcuff her and Elijah during the search. "Officers executing a search warrant for contraband have the authority to detain the occupants of the premises while a proper search is conducted." *Muehler v. Mena,* 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (citing *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). "Inherent in [that] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* Thus, "[t]he use of handcuffs to detain occupants of the target of a search warrant is reasonable when the 'governmental interests outweigh the marginal intrusion.' " *Pina v. City of Hartford,* Civil Action No. 07–cv–0657(JCH), 2009 WL 1231986, at *7 (D.Conn. Apr. 29, 2009) (quoting *Muehler,* 544 U.S. at 99, 125 S.Ct. 1465). Here, plaintiffs were handcuffed at the beginning of the early morning search. Elijah was released approximately ten minutes later and left the house shortly thereafter. Jackson, meanwhile, was wearing a t-shirt and underwear, and a female officer assisted her in getting dressed about twenty to thirty minutes after the search began. (Jackson Dep. at 33–34, 54–55, 64–65.) There is no evidence that any officers used excessive force in handcuffing Jackson or detaining her during the search. Jackson, thus, has proffered no evidence of any special circumstances that might have made her detention during the search unlawful. *See Rivera v. United States,* 928 F.2d 592, 606 (2d Cir.1991) ("Absent special circumstances, the police … have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion.").

 Second, with respect to the allegedly excessive property destruction, the Court recognizes that "[s]ome property damage caused during a lawful search is not *per se* unreasonable within the meaning of the Fourth Amendment." *Koller v. Hilderbrand,* 933 F.Supp.2d 272, 278 (D.Conn.2013). "The reasonableness of

the damage must be evaluated with reference to the target of the search," such as a more invasive contraband search. *Id.* (citing *Dockery v. Tucker*, No. 97–cv–3584 (ARR)(RLM), 2008 WL 2673307, at *10 n. 8 (E.D.N.Y. June 26, 2008)). "Even some disarray in conducting a search, including the tangential destruction of items that could not contain the object of the search does not necessarily constitute a Fourth Amendment violation." *Id.* (internal quotation marks omitted).

Here, plaintiffs do not claim that the search was overly long or that the officers unreasonably prolonged it in the hopes of discovering contraband. There also is no evidence that the officers destroyed or damaged any of Elijah's property, warranting summary judgment to defendants on his claim. Instead, the key question concerns Richert's and the officers' actions throughout the rest of the home. The photographs taken by plaintiffs show flipped and cut furniture, a disassembled coat rack, property strewn across the floor of the basement, damage to ceramic bowls and a bird feeder stand, damage to picture frames, a scratched end table, and marks to backs of leather furniture. Jackson identified the photographs, damage, and disarray depicted during her deposition. (*See* Jackson Dep. at 263–305.) Further, although Richert testified that the execution of the search was in line with his training and previous experiences, Jackson testified that he destroyed items in her home unnecessarily. Moreover, on the issue of personal involvement, Richert testified that he helped coordinate the search, even though he was not the primary supervisor.

Although the Court recognizes that searches for contraband generally are comprehensive and may necessarily entail some property destruction to find hidden contraband, "establishing as a matter of law that property damaged in the course of a search was the result of reasonable and nonmalicious police action presents a difficult task at the summary judgment stage." *Koller*, 933 F.Supp.2d at 280. In the instant case, viewing the evidence and drawing all reasonable inferences in plaintiffs' favor, including the nature of the destroyed property, Jackson has raised a genuine factual question, in the aggregate, about whether the police conducting the search acted reasonably and/or without malice. As noted *supra*, plaintiff testified to the following substantial damage to property: (1) that her kitchen was "totally destroyed," (2) that her living room furniture was flipped upside down and cut, (3) that Jeffrey's clothes were left in a bathtub, (4) that the basement carpet was ripped up, the basement furniture was cut open, and basement doors were taken off their hinges, and (5) that dishes and other items were broken and left in the driveway. (Jackson Dep. 105, 116, 124–28, 139.)[10] Although defendants argue that any damage to property was incidental to the lawful search, a rational jury could reject that argument and credit Jackson's testimony regarding the destruction of the food and other personal items such as ceramic bowls (thrown in the driveway), and decide that such actions were unnecessary and unreasonable (and even malicious) in the context of the search, and also find that the unreasonable destruction of property was substantial. *Compare*

---

**10.** Jackson also testified that, during the search, Officer Richert kept demanding to know where the drugs were, and that the officers were "threatening me telling me that he's going to bust up my TVs, put holes in the walls and a bunch of stuff." (Jackson Dep. 114.) Jackson further testified that they said they were "gonna destroy everything I had." (*Id.* at 115.)

*Hodge v. Vill. of Southampton,* 838 F.Supp.2d 67, 83 (E.D.N.Y.2012) (granting summary judgment to defendants where plaintiff only produced evidence of minimal damage to van—the need to replace ashtray and glue down portions of rug), *with Ochoa,* 2011 WL 3267705, at *6 (denying summary judgment where plaintiffs produced evidence that officers threw dental products on ground and destroyed them, which could constitute actions unnecessary to search of car for drugs). In addition, given the factual disputes regarding the nature of his involvement in the search and his supervision (or coordination of the efforts) of other officers, a rational jury could conclude that Richert is liable because he was personally involved in the unconstitutional conduct or "fail[ed] to intercede to prevent the constitutional violations of other officers where the officer had reason to know such a violation was occurring and had a realistic opportunity to intercede." *Blake v. Race,* 487 F.Supp.2d 187, 207 (E.D.N.Y.2007); *see Provost v. City of Newburgh,* 262 F.3d 146, 168 (2d Cir.2001) (" 'It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.' " (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994))); *Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be.").

In sum, these factual disputes need to be resolved by a jury in this case in order to determine the reasonableness of the scope and manner of the execution of the search warrant under the Fourth Amendment. Accordingly, the Court denies summary judgment as to Jackson's unlawful search claim against Richert relating to the June 3, 2011 search.[11]

## B. *False Arrest and Imprisonment, and Malicious Prosecution*

 Defendants move for summary judgment on the false arrest and false imprisonment claims on the grounds that the police had probable cause to arrest Jackson. "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir. 2003) (quoting *Weyant,* 101 F.3d at 852 (false arrest) and citing *Conway v. Vill. of Mount Kisco,* 750 F.2d 205, 214 (2d Cir. 1984) (malicious prosecution)). Further, under New York law, "the tort of false arrest is synonymous with that of false imprisonment," and courts use that tort to analyze an alleged Fourth Amendment violation in the Section 1983 context. *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *see Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). Thus, in this section, the Court considers the false arrest, false imprisonment, and malicious prosecution claims collectively.

11. Summary judgment also is not appropriate on qualified immunity grounds because the factual disputes discussed above, regarding Richert's alleged conduct during the search and whether there was gratuitous and/or malicious property damage, are also relevant to the determination of whether it was objectively reasonable for him to believe his acts were lawful. *See, e.g., Pooler v. Hempstead Police Dep't,* 897 F.Supp.2d 12, 29–30 (E.D.N.Y. 2012). For example, if the jury were to determine that Richert maliciously and/or gratuitously destroyed Jackson's property during the search with no legitimate law enforcement reason (as plaintiffs assert), he would not be entitled to qualified immunity.

### 1. False Arrest

 To prevail on a false arrest claim, a plaintiff must prove four elements: "(1) the defendant intended to confine [her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. New York*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). In the instant case, only the final element is in dispute; defendants argue that Jackson's arrest was privileged because it was supported by probable cause. *See Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir.2007) (" 'The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ....' " (quoting *Weyant*, 101 F.3d at 852) (internal citations omitted)).[12] At the summary judgment stage, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (internal citations omitted). "Even where factual disputes exist, as in this case, a § 1983 claim may fail if the plaintiff's version of events establishes probable cause to arrest." *Mistretta v. Prokesch*, 5 F.Supp.2d 128, 133 (E.D.N.Y. 1998).

 "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. Further, the "validity of an arrest does not

depend upon an ultimate finding of guilt or innocence." *Peterson v. Cnty. of Nassau*, 995 F.Supp. 305, 313 (E.D.N.Y.1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Under the collective knowledge doctrine, if one law enforcement officer has probable cause to arrest, cooperating law enforcement officers are deemed to have probable cause as well. *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir.2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' " (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983))).

Even if a state actor deprives an individual of his constitutional rights, the doctrine of qualified immunity shields that government official from civil liability if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.' " *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir.2006) (quoting *Thomas v.*

---

**12.** "The same holds true for the false imprisonment claims because, under New York law, the claim is identical to a false arrest

claim...." *Kilburn v. Vill. of Saranac Lake*, 413 Fed.Appx. 362, 363 (2d Cir.2011).

*Roach,* 165 F.3d 137, 142 (2d Cir.1999)). Thus, qualified immunity is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Accordingly, the availability of qualified immunity should be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

■■■ "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant,* 101 F.3d at 858 (internal citations, quotation marks, and alterations omitted). In the context of a false arrest claim, an arresting officer is entitled to qualified immunity if either: (a) the arresting officer's belief that probable cause existed was objectively reasonable, or (b) "officers of reasonable competence could disagree on whether the test for probable cause was met." *Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir.2007) (internal citations and quotation marks omitted). The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they believe to be lawful— should not be held personally liable.

*Cerrone v. Brown,* 246 F.3d 194, 202–03 (2d Cir.2001) (internal citations, quotation marks, and alterations omitted). In particular, the Second Circuit has affirmed that " '[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause.... If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins,* 478 F.3d at 87. Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "if the *undisputed facts* and all permissible inferences favorable to the plaintiff show ... that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan,* 439 F.3d at 147–48 (internal citation and quotation marks omitted).

■■■ In the instant case, defendants argue that there was probable cause to arrest Jackson under a theory of constructive possession because of the following: (1) she resided at the house; (2) officers discovered drugs in a jacket pocket in a dining room closet; (3) the officers could not determine to whom the drugs belonged, and Jeffrey did not admit the drugs belonged to him; and (4) there was probable cause to believe that both Jackson and her husband had a sufficient level of control over the area where the narcotics were found. Jackson counters that Richert testified that he knew all of the evidence would relate to Jeffrey and that he believed nothing the officers would find in the house belonged to Jackson; after the first search, a written complaint was made about the search; and the officers made racist statements during the first search. Plaintiffs' arguments are unconvincing.

■ Under New York law, "constructive possession ... requires a showing that the defendant 'exercised dominion or control over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized.'" *Martinez v. Reynolds*, 888 F.Supp. 459, 463 (E.D.N.Y.1995) (quoting *People v. Manini*, 79 N.Y.2d 561, 573, 584 N.Y.S.2d 282, 594 N.E.2d 563 (1992)); *see Cammick v. City of New York*, No. 96 Civ. 4374(RPP), 1998 WL 796452, at *3 (S.D.N.Y. Nov. 17, 1998) (constructive possession of illegal contraband may be attributed to all persons exercising "dominion and control over the area in which the property is found"); *Torres v. Hanslmaier*, No. 94 Civ. 4082(MGC), 1995 WL 272527, at *2 (S.D.N.Y. May 8, 1995) (holding that where jury could find that defendant resided at apartment and admitted that any drugs therein belonged to him, there was "circumstantial evidence that he had constructive possession over the contraband contained within it").

■ Here, based upon the undisputed facts, Richert, at a minimum, had arguable probable cause to arrest Jackson and, thus, is entitled to qualified immunity. As a threshold matter, although plaintiff argues that Richert's subjective motivations or beliefs undermine the probable cause for the arrest, it is well settled that the officers' subjective motivation for the arrest is irrelevant to the probable cause determination. *See Arkansas v. Sullivan*, 532 U.S. 769, 771–72, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001) (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Jackson

does not dispute the following: (1) she resided at the house; (2) the officers discovered the drugs in a jacket pocket in a common area of the house—namely, a dining room closet;[13] and (3) Jeffrey did not admit the drugs belonged to him. Moreover, in the opposition papers, Jackson does not contend (and there is no evidence to support a contention) that she did not have "dominion or control" over the house and the dining room closet (including the contents of the closet). Given those undisputed facts, Richert had arguable probable cause to arrest Jackson under a theory of constructive possession.

The Court recognizes that some courts have suggested that probable cause may not exist based upon residency alone, if the contraband was inside clothing in a common area, rather than in plain view. *See, e.g., United States v. Ortiz*, 943 F.Supp.2d 447, 458 (S.D.N.Y.2013) (no probable cause to arrest defendant's aunt, who was a co-tenant of apartment, where gun was found in jacket pocket in a hallway closet). However, other courts have made no such distinction and, thus, have suggested that dominion and control over a common area by a resident is sufficient. *See People v. Mayo*, 59 A.D.3d 250, 253, 873 N.Y.S.2d 584 (1st Dep't 2009) ("The controlling legal standards are clear. To establish constructive possession, the People must show that the defendant exercised dominion or control over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized.") (quotations and citation omitted); *People v. Diaz*, 220 A.D.2d 260, 632 N.Y.S.2d 82

**13.** The jacket was a Harley Davidson jacket, but the officer testified that he did not know whose jacket it was. In particular, he noted that he had seen both Jeffrey and Jackson on Jeffrey's motorcycle in the past. (Richert Dep. at 73–75.) Moreover, although Richert testified that (going into the search) he did not believe Jackson was a suspect and believed nothing the officers would find would be Jackson's, he also explained that (after discovering the drugs) he believed that it could have just as easily been Jeffrey Jackson's jacket as Julie Jackson's jacket. (*Id.* at 85–86.)

(N.Y.App.Div. 1st Dep't 1995) ("Where, as here, the evidence demonstrates that defendant owned, rented or had control over a possessory interest in, the apartment where drugs were found, the evidence is legally sufficient to establish his constructive possession of such drugs."); *see also United States v. Sedillo,* 509 Fed.Appx. 676, 679–80 (10th Cir.2013) ("First, [the defendant] does not deny he lived in the house, nor does he suggest that he could not access the closet. His mother's testimony, that she never saw [the defendant] open the closet, is besides the point because we only ask whether [the defendant] *has the power* to access the gun, not whether he actually did. Second, we find that, in the case of two occupants where one occupant denies knowledge of a shotgun, it is plausible to infer the other occupant knew about the shotgun.") (emphasis in original) (citations omitted); *Cammick,* No. 96 Civ. 4374(RPP), 1998 WL 796452, at *5 ("[T]here is also a presumption of the common law that a person is in constructive possession of property when she exercises dominion and control over the area in which the property is found. Plaintiffs' arguments that the pistol was found in a closet which also contained men's clothing and that the defendants 'did not possess knowledge that would allow them to conclude that the weapon belonged to either Caprice or Danielle' are irrelevant. Caprice and Danielle were arrested for criminal possession, not ownership, of a firearm. The gun was still in the plaintiffs' constructive possession because they jointly exercised dominion and control over their apartment.") (citations omitted).

Moreover, the cases where no probable cause has been found are factually distinguishable from the instant case. For example, in *Ortiz,* the gun was found inside the breast pocket of a man's coat in a closed closet, but the defendant also admitted to the officers that the closet housed his possessions. Thus, the court determined that there would be no probable cause to arrest the defendant's elderly aunt. 943 F.Supp.2d at 458. Here, Jeffrey did not acknowledge that the clothes in the dining room closet belonged to him, nor did he acknowledge that the drugs in the jacket belonged to him.

In addition, in the instant case, Richert had found drugs and a gun in a search of a prior residence shared by Jackson and Jeffrey less than a year earlier. That prior search gave Richert additional basis to believe that Jackson had knowledge of, and exercised dominion and control over, contraband in common areas of the house. In *Caraballo v. City of New York,* the Second Circuit reached a similar conclusion in holding that the officers were entitled to qualified immunity in connection with a false arrest claim arising from arrest of residents of an apartment in which drugs were found. The Second Circuit explained:

> The undisputed facts establish that plaintiffs were sleeping in a small apartment in which police found drugs on more than one occasion, including at the time of the arrest, and that [the officers] found suspected MDMA in a common area of that apartment. These circumstances were arguably sufficient to warrant a prudent person to believe that the plaintiffs were [sic] had knowledge of, and exercised dominion and control over, the suspected contraband, and thus to provide arguable probable cause for plaintiffs' arrest and temporary imprisonment. Defendants are therefore entitled to qualified immunity.

526 Fed.Appx. 129, 131 (2d Cir.2013) (quotations and citation omitted).

As the Supreme Court has noted, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to

money damages for picking the losing side of the controversy." *Wilson v. Layne,* 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *see also Safford Unified Sch. Dist. v. Redding,* 557 U.S. 364, 378–79, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) ("We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt that we were sufficiently clear in the prior statement of law. We conclude that qualified immunity is warranted."); *Zieper v. Metzinger,* 474 F.3d 60, 71 (2d Cir.2007) ("the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law") (internal quotations and citations omitted); *Moorman v. Thalacker,* 83 F.3d 970, 974 (8th Cir.1996) ("The law of 'attempt' is complex and fraught with intricacies and doctrinal divergences. Qualified immunity protects prison officials from liability for their objectively reasonable efforts to divine whether a course of conduct amounts to an 'attempt,' even should their answer be arguably wrong.").

In short, although the right to be free from unlawful search and seizure was clearly established as a general proposition, it would not be clear to a reasonable officer, based upon language in both federal and state decisions on constructive possession discussed above, that his conduct was unlawful in the situation confronted by Richert in connection with the arrest of Jackson. In other words, based upon the undisputed facts, officers of reasonable competence could disagree on whether probable cause existed to arrest Jackson on a theory of constructive possession. Thus, this Court cannot say, even assuming arguendo that Richert lacked probable cause, that the unlawfulness of his conduct was apparent in light of pre-existing law. *See Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034. Accordingly, the Court grants summary judgment to defendant Richert on the false arrest and imprisonment claims on the grounds of qualified immunity.

### 2. Malicious Prosecution

■ "Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law—in this case, New York state law—for such rules." *Conway,* 750 F.2d at 214. "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Blake,* 487 F.Supp.2d at 211 (quoting *Jocks,* 316 F.3d at 136) (internal quotation marks omitted).

■ According to plaintiffs, the case against Jackson was dismissed in November 2012. In the instant case, only the final two elements are in dispute in connection with the motion. As to the third element, the Second Circuit has held,

Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause.... In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery

of some intervening fact.... The New York Court of Appeals has noted that the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.

*Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996) (internal citations and quotation marks omitted); *see Korthas v. City of Auburn,* No. 5:04–CV–537 (NPM/GHL), 2006 WL 1650709, at *15 (N.D.N.Y. June 9, 2006) ("Police officers may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause.... [A] failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause." (internal citations and quotation marks omitted)). Concerning the fourth element, malice, "[i]n most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Lowth,* 82 F.3d at 573 (quoting *Conkey v. New York,* 74 A.D.2d 998, 999, 427 N.Y.S.2d 330 (N.Y.App.Div.1980)); *see Cunninham v. New York City,* No. 04–CV–10232 (LBS), 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same); *Mesiti v. Wegman,* 307 A.D.2d 339, 763 N.Y.S.2d 67 (2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.'" (quoting *Martin v. City of Albany,* 42 N.Y.2d 13, 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304 (1977))).

██ In this case, there is no contention by the plaintiffs that any evidence came to light after the arrest of Jackson (*i.e.,* during the commencement or continuation of the prosecution) that undermined the probable cause assessment that was made by Richert at the time of the arrest. Under such circumstances (*i.e.,* no contention

of new evidence between arrest and prosecution), for the same reasons that Richert is entitled to qualified immunity for the false arrest/imprisonment claims, he also is entitled to qualified immunity for the malicious prosecution claims. *See, e.g., Roberts ex rel. Estate of Roberts v. Lapp,* 297 Fed.Appx. 67 (2d Cir.2008) ("[B]ecause both Lapp and the police officers are entitled to qualified immunity [with respect to the claims relating to the stop and arrest], they are also entitled to summary judgment on the Roberts's malicious prosecution and familial relations claims."); *Bouche v. City of Mount Vernon,* No. 11 Civ. 5246(SAS), 2013 WL 322613, at *7 (S.D.N.Y. Jan. 28, 2013) ("As it has been established that defendants had at least arguable probable cause to arrest Bouche, defendants are entitled to qualified immunity as to both the false arrest and malicious prosecution claims."); *Ketchuck v. Boyer,* No. 3:10–CV–870 (TJM/DEP), 2011 WL 5080404, *7 (N.D.N.Y. Oct. 25, 2011) ("Finally, for the reasons discussed above with regard to Trooper Boyer's entitlement to qualified immunity on the false arrest charge, he is also entitled to qualified immunity on the malicious prosecution claim. That is, under the circumstances it was objectively reasonable for reasonable officers to believe that there was probable cause to commence the prosecution for the offenses charged.").

Accordingly, the Court grants summary judgment on the malicious prosecution claim.

### C. *Malicious Abuse of Process*

██ In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law as well as the deprivation of a constitutional right. *See Cook v. Sheldon,* 41 F.3d 73, 79–80 (2d Cir.1994). A plaintiff may assert a malicious abuse of process claim where a de-

fendant: " '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.' " *Savino,* 331 F.3d at 76 (quoting *Cook,* 41 F.3d at 80); *see also Sullivan v. LaPlante,* 1:03 CV 359(OGS), 2005 WL 1972555, at *3 (N.D.N.Y. Aug. 16, 2005) ("[A]buse of criminal process is actionable under § 1983 as a denial of procedural due process." (citing *Cook,* 41 F.3d at 80)); *Dickerson v. Monroe Cnty. Sheriff's Dep't,* 114 F.Supp.2d 187, 192 (W.D.N.Y.2000) (" 'In the criminal context, malicious abuse of process is by definition a denial of procedural due process.' " (quoting *Cook,* 41 F.3d at 80)).

■ Defendants argue that summary judgment is warranted because, *inter alia,* plaintiffs did not plead what the "collateral objective" was nor adduce evidence of the same. The opposition does not address this claim. Plaintiffs have not pointed to any evidence in support of the abuse of process claim. Even assuming *arguendo* that the alleged collateral objective was to punish Jackson for her complaint, there is no evidence to support that conclusory contention.

■ Accordingly, the Court grants summary judgment to defendants on the abuse of process claim.[14]

## D. *Equal Protection*

■ In order to hold any defendant liable for intentional discrimination under Section 1983, plaintiffs must provide proof of the defendant's discriminatory intent. *See Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir.2012). "[L]iability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose. Purposeful discrimination requires more than intent as volition or intent as awareness of consequences.... It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* (citing and quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal citation and quotation marks omitted).

■ Defendants argue that summary judgment is appropriate because there is no evidence of any selective application of state law against plaintiffs based on impermissible considerations or from bad faith. Plaintiffs do not address the merits of the equal protection arguments in their opposition, and there is no evidence that any actions were undertaken with purposeful discrimination, any selective treatment compared to any other similarly situated parties, any intent to punish, or any intent to inhibit the exercise of any constitutional rights. Moreover, the record is devoid of

---

**14.** In the alternative, the Court also concludes that Richert would be entitled to qualified immunity on the malicious abuse of process claims. As discussed *supra,* the uncontroverted evidence demonstrates that, at the very least, "officers of reasonable competence could disagree on whether the probable cause test was met." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007). Thus, given numerous district courts in this Circuit have suggested that probable cause is a complete defense to a claim for abuse of process, Ric-

hert also is entitled to qualified immunity on the abuse of process claim. *See Mangino v. Inc. Vill. of Patchogue,* 814 F.Supp.2d 242, 249–51 (E.D.N.Y.2011) (discussing qualified immunity issue in the context of abuse of process claims given ambiguity in the case law); *see also Ketchuck v. Boyer,* No. 3:10–CV–870 (TJM/DEP), 2011 WL 5080404, at *8 (N.D.N.Y. Oct. 25, 2011) (finding qualified immunity as to abuse of process claim based on arguable probable cause).

any evidence that Richert, the only named defendant, acted with discriminatory intent. Jackson testified that the officer who made the allegedly derogatory remarks towards her was not Richert.

Accordingly, the Court grants summary judgment to defendants on the equal protection claim.

### E. *Municipal Liability*

Plaintiffs also seek to hold the municipal defendants liable for any misconduct by the Task Force's officers. As set forth below, the Court concludes that these claims cannot survive summary judgment.

The Supreme Court has explained that a municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Social Servs. of N.Y.C.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir.1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018) (internal quotation marks omitted). Moreover, a policy, custom, or practice of the entity may be inferred where " 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir.2004) (quoting *Kern*, 93 F.3d at 44). However, a municipal entity may be held liable only where the entity itself commits a wrong;

"a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018.

 With respect to the County and Southold, plaintiffs argue that they should be held liable because (1) Richert testified that he received no formal training on the execution of search warrants prior to or during his work with the Task Force; (2) there have been widespread allegations and reports of discriminatory policing by the County Defendants, leading to a settlement with the Department of Justice; (3) the Southold Defendants also controlled Richert's actions, and any argument that there is no evidence of a discriminatory policy, custom, or failure to train by Southold is belied by the fact that Sinning was the subject of a lawsuit alleging mistreatment by a black citizen and yet did not receive training in response, and Richert did not recall receiving any training on racial issues, either.

 "The failure to train or supervise [municipal] employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir.2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Deliberate indifference exists when the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation' "; and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 195–96 (quoting *Walker v.*

*City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)). Recently, the Supreme Court has reiterated that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). However, " 'in a narrow range of circumstances,' " where unconstitutional actions are the obvious consequence of a failure to train, "a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 1361 (quoting *Bryan Cnty.,* 520 U.S. at 409, 117 S.Ct. 1382).[15]

Turning to the case at bar, there is an absence of any evidence of an unconstitutional policy, practice, or custom by either municipal defendant, or a failure to supervise or train, as it relates to the issues in this case. Plaintiffs' complaint and opposition merely contain vague and conclusory assertions that the County and Southold should have known that officers would encounter these situations, and that they did not adequately train officers to respond. These assertions, without any actual supporting evidence, are insufficient to withstand summary judgment.

▉▉▉▉ First, plaintiffs point to no actual policy or custom to execute more searches against black residents or any other residents in an unconstitutional manner, or any evidence from which such policy or custom could be inferred. Plaintiffs have not even alleged that officers acted in an unconstitutional manner during the second search. Second, Richert testified that

he received formal training at the SCPA regarding the execution of search warrant and relationships with minority communities, and on-the-job training from SPD and the Task Force. Sinning received similar training. As noted *supra,* " 'a single incident is generally insufficient to demonstrate liability under a failure to train theory.' " *Perez v. N.Y.C. Dep't of Corr.,* No. 10–CV–2697 RRM RML, 2013 WL 500448 (E.D.N.Y. Jan. 17, 2013) (quoting *Rubio v. Cnty. of Suffolk,* No. 01–CV–1806 (TCP), 2007 WL 2993833, at *8 (E.D.N.Y. Oct. 9, 2007), *aff'd,* 328 Fed.Appx. 36 (2d Cir. 2009)) (brackets omitted); *see White–Ruiz v. City of New York,* No. 93CIV.7233(DLC)(MHD), 1996 WL 603983, at *10 (S.D.N.Y. Oct. 22, 1996) (denying summary judgment on failure to train or supervise claim because, *inter alia,* "[t]he [Mollen] Commission report and the testimony of former Commissioner Kelly provide sufficient evidence of the pervasiveness of police misconduct and retaliation against 'rats' and the sure knowledge of the Police Department regarding the need for better training in this area."). Plaintiffs have not pointed to any evidence of a pattern of incidents regarding these officers or the Task Force. The County's settlement with the Department of Justice involved policing against Latinos, *See United States Agrees to Comprehensive Settlement with Suffolk County Police Department to Resolve Investigation of Discriminatory Policing Against Latinos,* U.S. Department of Justice (Dec. 3, 2013), http://www.justice.gov/opa/pr/2013/December/13–crt–1273.html, and the details of that settlement are not in evidence. There also is no basis for a rational jury to conclude that Sinning should have been

---

**15.** For example, in *Canton,* the Supreme Court hypothesized that a municipality's decision not to train its police officers on the constitutional limits to the use of deadly force

"could properly be characterized as 'deliberate indifference' to constitutional rights" because the need for such training is "so obvious." 489 U.S. at 390 n. 10, 109 S.Ct. 1197.

disciplined following the complaint against him, or that Richert and the Task Force have acted unreasonably in the past during searches. In fact, even if they had acted unreasonably in the past, "a policy [cannot] ordinarily be inferred" "from the failure of those in charge to discipline a single police officer for a single incident of illegality." *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.1980). Finally, plaintiffs have proffered no evidence from which a reasonable factfinder could conclude that the training provided was tantamount to a lack of training because the officers have an "utter lack of an ability to cope with constitutional situations," *Connick,* 131 S.Ct. at 1363, and "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights." *Canton,* 489 U.S. at 390, 109 S.Ct. 1197. *Accord Harvey v. Campbell Cnty.,* 453 Fed.Appx. 557, 567 (6th Cir.2011) (" 'For liability to attach in the instance of a single violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.' " (quoting *Hays v. Jefferson Cnty.,* 668 F.2d 869, 874 (6th Cir.1982))). In short, there is no evidence from which a rational jury could conclude that the Task Force ransacked plaintiffs' home, or arrested Jackson for constructive possession of drugs, pursuant to a municipal policy or deliberate indifference to a need for more training.[16]

Accordingly, the Court grants summary judgment to the municipal defendants on the *Monell* claim.[17]

## IV. CONCLUSION

For the foregoing reasons, the Court grants summary judgment to defendants on all claims except Jackson's unlawful search claim against defendant Richert in connection with the June 3, 2011 search.

SO ORDERED.

---

**16.** To the extent that plaintiffs are seeking to base the *Monell* claim on the malicious prosecution or abuse of process claims, the *Monell* claim fails for the same reasons—that is, there is no evidence of a municipal policy or deliberate indifference to a need for training that could support a rational finding by a jury in favor of plaintiffs on those issues.

**17.** Because the Court resolves the issue on these grounds, it does not address the Southold Defendants' argument that Richert was under the Task Force's exclusive control and supervision.